**Alan D. PAUL, Plaintiff Below–Appellant,**

v.

**DELOITTE & TOUCHE, LLP and Deloitte & Touche, USA, LLP, Defendant Below–Appellee.**

No. 336, 2008.

Supreme Court of Delaware.

Submitted: March 4, 2009.

Decided: May 20, 2009.

---

Gary W. Aber, Esquire, (argued) of Aber, Baker & Over, Wilmington, DE, for appellant.

Sheldon N. Sandler, Esquire, (argued) and Maribeth L. Minella, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, and RIDGELY, Justices.

RIDGELY, Justice:

This appeal arises out of a contractual dispute between Plaintiff–Appellant Alan D. Paul and Defendants–Appellees Deloitte & Touche LLP ("D & T"), and Deloitte & Touche, USA, LLP ("D & T USA") (collectively, "Deloitte"), in which Paul was severed from the Deloitte part-

nerships. Deloitte and Paul have each filed an appeal from the Superior Court's grant of summary judgment. We first address Deloitte's cross-appeal regarding breach of contract.

Deloitte cross-appeals from the court's grant of partial summary judgment in favor of Paul on grounds that Deloitte breached the employment contract. Deloitte argues that the court erred in interpreting the contract as requiring that it complete the entire severance process prior to May 7, 2004, rather than merely requiring that it notify Paul, prior to May 7, that he had been severed as a partner and the specific date his partnership would end. We find merit to Deloitte's argument.

Paul appeals from the court's grant of summary judgment in favor of Deloitte on grounds that Paul suffered no damages from Deloitte's breach of his employment contract. Paul raises two arguments on appeal. First, he contends that the court erred by misconstruing his reasonable expectations as of the date of the making of the contract. Second, he contends that he is entitled to recover damages reasonably foreseeable for the breach of his employment contract. We find no merit to Paul's arguments. Accordingly, we affirm the Superior Court's grant of summary judgment in favor of Deloitte.

## I. Facts and Procedural History.

Deloitte has several subsidiaries that provide professional accounting, auditing, and related services to public and private clients. Paul was a partner in the Lead Tax Services ("LTS") section of Deloitte's Boston, Massachusetts office. Paul had previously been a partner with Arthur Andersen LLP ("Andersen"), but joined De-

loitte in May 2002, along with numerous other former Andersen partners.

### A. *Paul's admission as a partner.*

On April 2, 2002, D & T USA and Andersen entered into a "Memorandum of Understanding" (the "MOU"), with respect to the possible offer by Deloitte of partnerships to certain Andersen tax partners. On April 19, Deloitte extended a written offer to Paul to join as a tax partner. Paul accepted and Deloitte sent him a document confirming the terms of his admission as a partner (the "Admission Agreement"). He would serve in the LTS section of Deloitte's Boston office; he would be credited with 780 units of ownership; he would receive an initial biweekly draw in the amount of $10,770; and his required capital investment would be $741,000. Paul executed the Admission Agreement on May 4, 2002.

The Admission Agreement provided that Paul's admission was contingent on several events, including the finalization of the transaction between D & T USA and Andersen and Paul's acceptance and execution of two Memoranda of Agreement (each an "MOA" and collectively with the Admission Agreement, the "Partnership Agreements").[1] On May 7, 2002 D & T USA and Andersen executed the definitive agreement contemplated by the MOU and Paul's Admission Agreement (the "Andersen Agreement"). The Andersen Agreement stated that Deloitte had offered certain Andersen partners, including Paul, admission to the Deloitte partnership. Paul signed the MOAs the next day.

The MOAs set forth the partnership terms, such as entity governance, required capital contributions, earnings, retirement,

1. The Partnership Agreements provided that Delaware law would govern and that the parties accepted Delaware state and federal courts as the sole venue for the resolution of disputes.

disability and death benefits, and conditions of separation. They provided that a partner could be "involuntarily terminated" in two ways. First, he could be severed by a vote of the Board, which had to be approved by a majority of all active partners. Under this provision, there was no requirement of "cause" for termination. Second, a partner could be severed if the Board unanimously voted that the partner had engaged in certain identified conduct, with a supermajority of Board members required for a quorum.

The Admission Agreement added a "cause-based" termination section in § 5(a) and provided for an additional method of involuntary termination without cause in § 5(b). This provision was unique to the partners who, like Paul, joined Deloitte in connection with the Andersen Agreement. During the first two years of their partnerships, the former Andersen partners could be involuntarily severed by vote of an appointed six-person committee rather than the Board and a majority of the partners. Specifically, § 5(b) of the Admission Agreement provided:

> In addition to those circumstances set forth in the second sentence of Section 7.03 of the Memorandum of Agreement of each Firm, you shall be deemed to have severed your association with each Firm ... (b) as of the date specified within two years after the Effective Date[2] by a committee ..., which shall consist of three tax partners and principals of D & T USA who had been partners of [Andersen] and three tax partners and principals of D & T USA who had not been partners of [Andersen], with the leader of D & T's tax practice able to cast the deciding vote if such committee is deadlocked.

This more streamlined method of involuntary severance, unique to the former Andersen partners, placed the severance decision in the hands of what became known as the "Committee of 6" for a two year period, the last day of which was May 6, 2004. This system was a logistical necessity because of the virtually simultaneous admission of more than 160 new partners. Bradley Seltzer, a member of the Committee of 6, explained that with such a large influx of new partners arriving at almost the same time, Deloitte could not engage in the due diligence process it normally employed when considering the admission of a lateral partner. Mark Berkowitz, a former Andersen partner who joined Deloitte's Boston office with Paul, described the two-year period as a "probation period."

Deloitte understood the applicable language to mean that within two years, the Committee of 6 was required to conduct any vote to sever a partner, and to notify the partner to be severed of the date his severance would occur. Since the language did not say a person had to be severed by "a date within two years," but rather "a date specified within two years," Deloitte believed the actual severance could occur after the two year window as long as the partner was notified of the date of the severance within two years. This was consistent with the language used in the other severance sections of the Partnership Agreements.

B. *Paul's severance as a partner.*

On March 25, 2004, Vincent DeGutis, the "Partner in Charge" of Paul's office, and Frank Marcos, the "Partner in Charge" of Deloitte's tax practice in the Northeast Region, decided to recommend that Paul be severed from the partnerships. DeGutis and Marcos prepared a draft severance

---

**2.** The "Effective Date" was May 7, 2002, the     execution date of the Andersen Agreement.

recommendation, which they refined with the help of Steven Severin, one of the partners responsible for addressing Deloitte partners' performance throughout the country. The final recommendation was then submitted to the Committee of 6. On April 8, Marcos and DeGutis informed Paul of their recommendation. On April 12, the Committee of 6 met to consider the recommendation and voted unanimously to sever Paul from the Deloitte partnerships.

Marcos promptly informed Paul orally of the Committee's decision and offered Paul an additional severance payment of $50,000 based upon a notice date of April 12, 2004 (and corresponding last day of May 12, 2004) in exchange for his resignation and a general release. Paul initially accepted. Time passed while Paul and Marcos discussed the terms of Paul's resignation. Because of the delay, Paul received an additional two weeks' compensation (approximately $30,000), so Marcos reduced the additional severance offer to approximately $20,000. Paul ultimately declined the offer.

By letter dated April 22, 2004, within the two year window provided for in Paul's Admission Agreement, Deloitte informed Paul that the Committee of 6 had voted to sever him, gave him the required one month's notice "of such severance," and specified that his partnership was terminated effective May 27, 2004.[3] It is undisputed that Paul received the sums and accommodations to which he was entitled by his Admission Agreement, including about $215,000 in severance payments and a return of his capital, which was then $665,000. On May 11, 2004, Paul was of-fered a partnership in another Boston accounting firm, Vitale, Caturano & Company and, on June 14, less than three weeks after he was severed from Deloitte, Paul joined Vitale Caturano as a partner.

### C. The Superior Court's decision.

Paul filed suit against Deloitte in the Delaware Superior Court alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Paul moved for partial summary judgment, arguing that there was no genuine issue of fact that Deloitte had breached the contract. The Superior Court held that Paul was entitled to partial summary judgment on his breach of contract claim because the entire severance process had to be completed within two years. The court found that, although Deloitte notified Paul within two years that he had been severed as a partner and specified the date his partnerships would end, Paul's severance did not actually occur until three weeks after the two year period ended.

Deloitte then moved for summary judgment, arguing that Paul had suffered no damages as a result of that technical breach. On June 24, 2008, the Superior Court granted Deloitte's motion, observing that "Mr. Paul was on notice, prior to May 6th, that he was being severed, and therefore, the question is what are the reasonable expectations here." The court held that "[Paul] expected either to be severed prior, within the two year period of time, and if he were not that certain other provisions of the agreement with Deloitte would be triggered"; that since Paul "was notified of the severance within the two years

---

3. Paul claims that he did not receive the letter until April 27, which was, nevertheless, within the two-year window. The e-mail exchange he cites, the related e-mails, as well as his own self-serving memo, indicate that any delay was due to the continual discussion with him about a possible resignation. After he declined to resign and he was given writ-ten notice of his severance, he asked "why the 27th was used vs. the 29th which was originally discussed with him." In an apt example of the maxim "no good deed goes unpunished," the reason was to allow Paul to avoid having to make a profit sharing plan contribution of $40,000.

... [t]he two year expectation was met"; that "all terms of compensation under the agreement of 2002 were met"; and "[t]o argue otherwise would be just unreasonable and would be a windfall." This appeal followed.

## II. Discussion.

■ We review the Superior Court's decision on a motion for summary judgment *de novo*, applying the same standard as the trial court.[4] We must determine "whether the record shows that there is no genuine material issue of fact and the moving party is entitled to judgment as a matter of law."[5] When the evidence shows no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to demonstrate that there are genuine issues of material fact that must be resolved at trial.[6] If there are material facts in dispute, it is inappropriate to grant summary judgment and the case should be submitted to the fact finder to determine the disposition of the matter. Questions concerning the interpretation of contracts are questions of law, which we review *de novo*.[7]

A. *The Superior Court erred in granting partial summary judgment in favor of Paul on the breach of contract claim.*

■ Deloitte contends, on cross-appeal, that the Superior Court erred in granting Paul's motion for partial summary judgment on the breach of contract claim. Deloitte argues that the Admission Agreement required it only to *specify* the effective date of Paul's severance before May 7, 2004, rather than actually *effectuate* Paul's severance prior to that date. Deloitte also argues that Paul waived this condition by accepting his severance payment and return of capital and not returning or offering to return them.

■ Deloitte's first argument requires an interpretation of the Admission Agreement. In analyzing disputes over the language of a contract, we give priority to the intention of the parties.[8] We start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language.[9] "In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning."[10]

The language at issue on this appeal is § 5(b) of the Admission Agreement, which provides for severance of the partnership "as of the date specified within two years after [May 7, 2002] by [the Committee of 6]. . . ." Both parties claim that the language clearly and unambiguously supports their interpretation; yet the parties' interpretations are irreconcilable. Paul claims

4.  *Berns v. Doan*, 961 A.2d 506, 510 (Del.2008) (citing *Williams v. Geier*, 671 A.2d 1368, 1375 (Del.1996)); *Grabowski v. Mangler*, 956 A.2d 1217, 1220 (Del.2008)

5.  *Berns*, 961 A.2d at 510 (quoting *Williams*, 671 A.2d at 1375).

6.  *Grabowski*, 956 A.2d at 1220; *Moore v. Sizemore*, 405 A.2d 679, 681 (Del.1979).

7.  *Motorola, Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del.2008).

8.  *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del.1985) (citing *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329 (Del.1939)).

9.  *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del.1996); *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113.

10.  *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.2006); *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992); *accord Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del.Ch.2006).

that the phrase should be read as the "date specified by the Committee of 6" must be "within two years after May 7, 2002"; and therefore he argues that he was improperly severed from Deloitte because he remained a partner for three weeks after May 7, 2004. Deloitte, on the other hand, claims that the phrase should be read as the "date" must be "specified by the Committee of 6 within two years after May 7, 2002"; and therefore it argues that it complied with the language of the Admission Agreement by specifying to Paul before the end of the two year period the date he would be severed.

The parties' differing interpretations are, at bottom, a grammatical dispute. The word "specified" can act either as a verb or as an adjective. Paul advocates treating the word "specified" as an adjective describing the word "date" and the phrase "within two years after May 7, 2002" as an adjective phrase also modifying the word "date." However, this reading ignores the remainder of the clause which includes the additional phrase "by the Committee of 6." The only way to read the entire clause giving effect to this second phrase is to treat both as adverbial phrases describing the verb "specified," and not the noun "date specified."

This is illustrated by removing the word "specified" from the sentence: "You shall be deemed to have severed your association with each Firm as of a date ... within two years after May 7, 2002 by the Committee of 6." While the phrase "within two years after May 7, 2002" would still make sense within the context of the sentence, the phrase "by the Committee of 6" would not. Therefore, the phrase "by the Committee of 6" describes the word "specified" by indicating who or what specifies,

and the placement of the phrase "within two years after May 7, 2002" *in medio* indicates that it also describes the word "specified" by indicating when the specification must occur. As a result, § 5(b) did not require the effective date of Paul's severance to occur before May 7, 2004; instead, it required only that the Committee of 6 notify Paul of the effective date of his severance by May 7, 2004. Accordingly, the Superior Court erred in interpreting the clear and unambiguous language of § 5(b) of the Admission Agreement.

B. *The Superior Court did not err in granting summary judgment in favor of Deloitte because Paul is not entitled to damages for breach of contract.*

Paul contends that the Superior Court erred in concluding that he was not entitled to damages for breach of contract. Paul argues that the court misconstrued his reasonable expectations as of the date of the making of the Partnership Agreements. Paul also argues that he is entitled to recover the income he would have earned until his mandatory retirement at the age of sixty-two, less any income that he has and will earn in mitigation of those damages.

■■■ Assuming *arguendo* that Deloitte was in breach of the Partnership Agreements, in assessing the damages of such a breach, the non-breaching party is entitled to recover "damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made."[11] Contract damages "are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall."[12] "Expecta-

11. *Tackett v. State Farm Fire & Cas. Ins. Co.,* 653 A.2d 254, 264–65 (Del.1995)

12. *Huggins v. B. Gary Scott, Inc.,* 1992 WL 179482, (Del.Super.Ct. June 25, 1992); *Haft*

tion damages are measured by the losses caused and gains prevented by defendant's breach."[13]

■ Paul argues that at the time of entering the Partnership Agreements, he had a clear and distinct reasonable expectation that he would remain a partner in Deloitte until he reached the mandatory retirement age of sixty-two and was therefore an employee for a defined period. Of course, as Deloitte points out, that was not the whole of Paul's expectations, he also had a reasonable expectation that he could be severed without cause (a) within the first two years by vote of the Committee of 6; and (b) at any time by vote of the Board and approved by vote of a majority of all active parties. Thus, even after the two-year period elapsed, Paul remained subject to termination without cause—the only thing that changed was the identity of the decisive body. In addition, Paul had a reasonable expectation that he could be severed for cause at any time by vote of the Board for certain enumerated conduct. Therefore, Paul's status with Deloitte was indefinite and not, as Paul claims, for any definable or fixed term. Accordingly, Paul is not entitled to recover the income he would have earned until his mandatory retirement at the age of sixty-two less any income that he has and will earn in mitigation of those damages.

Even assuming Deloitte breached the employment contract, Paul's expectations regarding the Admission Agreement were satisfied. Paul was notified on April 8, 2004 that the Committee of 6 was considering a recommendation that he be severed. He was then informed of the com-mittee's decision to sever him orally on April 12, and in writing on April 22. Therefore, Paul's expectation of continuing as a partner with Deloitte was extinguished during the two year period. As the Superior Court noted, if Deloitte had used different language and said "effective April 22nd is the date of your severance but your last day of work will be May 27, 2004," the outcome would be the same.

Moreover, Paul lost nothing as a result of the three week delay. He knew within two years that he would be severed and was compensated fully until the actual date of severance. Paul received an additional three weeks of compensation as a result of Deloitte's breach. In addition, there is no evidence that the three week delay caused Paul any disadvantage in obtaining another position. Paul was offered a partnership at another accounting firm on May 11, 2004—even before his effective severance from the Deloitte partnerships—and began work less than three weeks later. Paul sustained no damages as a result of the delay in the effective date of his severance. Accordingly, the Superior Court did not err in granting summary judgment in favor of Deloitte.

### III. Conclusion.

The judgment of the Superior Court is **AFFIRMED.**

---

v. Dart Group Corp., 877 F.Supp. 896, 901 (D.Del.1995); accord Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (finding damages for a procedural due process violation would be a windfall rather than compensation if the outcome would have been the same if due process procedures had been followed)

13. ATACS Corp. v. Trans World Commc'ns., Inc., 155 F.3d 659, 669 (3d Cir.1998).