# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CM COMMERCIAL REALTY, INC., )
a Maryland Corporation Qualified to do )
business in Delaware, )
Plaintiff, )
)
v. ) C.A. NO. N19C-11-271 DJB
)
ALPHA TRUST REAL ESTATE, LLC, )
Successor in interest to ALPHA TRUST, )
LLC, and FINANCIAL & CONSULTING )
SERVICES, INC., )
Defendant. )
)

## AMENDED MEMORANDUM OPINION

Decided: February 18, 2022

Amended: February 24, 2022

*On cross Motions for Summary Judgment*
*Plaintiff's motion for summary judgment is GRANTED in part;*
*Defendant's Alpha Trust Real Estate, LLC's motion for summary judgment is*
*GRANTED in part, DENIED in part.*

Daniel C. Kerrick, Esquire, Hogan & McDaniel, Attorney for Plaintiff

Daniel F. McAllister, Esquire, Tarabicos, Grosso & Hoffman, LLP, Attorney
Defendants

**BRENNAN, J.**

1

Before the Court are cross-motions for summary judgment filed in this civil action involving claims related to an alleged breach of contract. Plaintiff CM Commercial Realty, Inc. (hereinafter "CM") alleges that Defendants Alpha Trust Real Estate, LLC (hereinafter "Alpha") and Financial & Consulting Services, Inc. (hereinafter "FCS"; collectively "Defendants")[1] breached a Commission Agreement between the parties in relation to a real estate brokerage deal. In this deal, CM and Alpha Trust, through its agent Robert Stella, agreed that should CM find a tenant for Alpha's property, Alpha would pay a set commission based up on a percentage of the rent. CM thereafter introduced Defendant Alpha to a tenant, Dollar Tree Stores, Inc. (hereinafter "Tenant"), and Alpha subsequently entered into a commercial lease with the tenant for a five (5) year period with two (2) options to extend. At the end of the lease extension periods, Tenant and Alpha created a "Lease Amendment", which extended the lease terms. Plaintiff, upon learning of the Lease Amendment, requested payment pursuant to the Commission Agreement. Upon Alpha's declination to pay, Plaintiff filed this instant action against Defendants, collectively. In the alternative to its breach of contract claim, Plaintiff additionally asserts a claim for unjust enrichment against Defendants.

---

[1] Defendant Financial Consulting Services, Inc. was not specifically mentioned in the briefing as having its own separate role in these exchanges by either party, and in fact, in the Answer to the Complaint (see Docket Item 8, Lexis Transaction ID 64564183) denied all allegations as to even background averments with respect to Defendant FCS, the Court will analyze these motions as pertaining to Defendant Alpha. The most the Court was given was a passing reference in Plaintiff's motion that was based upon "information and belief" regarding FCS involvement. There is simply no information in the record that would support any ruling by the Court at this time with respect to FSC. The Court, will, however, entertain future motions with respect to whether or not it is appropriate for FCS to remain as a Defendant in this matter.

On February 5, 2021, both parties moved for summary judgment on the basis that the Commission Agreement's unambiguous language entitles the respective party to judgment as a matter of law.[2]  After full briefing, the Court heard oral argument on the cross-motions on September 16, 2021, and took the matter under advisement.[3]  On October 4, 2021, however, Defendants filed a motion for rule to show cause.[4]  The Court stayed the decision on the cross-motions for summary judgment on October 6, 2021, pending the resolution of the rule to show cause.[5]  On November 18, 2021, Defendants withdrew their motion for rule to show cause.[6]  This is the Court's decision on the cross-motions for summary judgment.  For the reasons set forth below, Plaintiff's motion for summary judgment is **GRANTED**,[7] and Defendant Alpha's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

## I.    FACTS

CM is a commercial real estate brokerage firm that, among other things, helps bring tenants and landlords together to facilitate long-term commercial leases.  On December 14, 2003, Alpha, through Robert Stella, and CM executed a Commission Agreement, which was contingent upon a commercial lease being finalized between Alpha and Dollar Tree Stores, Inc/Tenant.[8]  The Commission Agreement obligated

---

[2]    D.I. No. 41-42.
[3]    D.I. No. 63.
[4]    D.I. No. 66.
[5]    D.I. No. 68.
[6]    D.I. No. 75.
[7]    Plaintiff did not move for summary judgment on the issue of Count 2 of their Complaint, but focused their arguments on Count 1.  To the extent their motions can be read to have included an argument for summary judgment on Count 2, it is **DENIED**.
[8]    Joint App. and Table of Contents ("Joint App.") at JX0001, Apr. 28, 2021 (D.I. 54).

Alpha to pay CM commissions upon certain triggering events. Specifically, the Commission Agreement provided:

> [Alpha] shall pay CM a commission equal to five percent (5%) of the aggregate base rent of the initial lease term. Said commission shall be paid in full upon the Tenant taking possession of the premises and making the first monthly installment of minimum rent. [Alpha] shall pay CM additional commission(s) equal to five percent (5%) of the aggregate base rent for each option/renewal term for which the Tenant exercises.[9]

On March 5, 2004, nearly three months after execution of the Commission Agreement, Alpha and Tenant executed an agreement (the "Lease" or "original Lease") to lease space located at Talleyville Shopping Center, 3603 Silverside Road, Wilmington, Delaware (the "Premises").[10] The Lease, a thirty-three (33) plus page document, among other things, provided Tenant with an initial lease term of five years and two additional five-year terms that were executable at the option of the Tenant. The Lease identified the three lease terms as the Original Lease Term, the First Renewal Term, and the Second Renewal Term. The Tenant exercised both the First and Second Renewal Term under the Lease.[11] Pursuant to the Commission Agreement, Alpha paid CM a commission for all three terms.[12]

As the Lease's Second Renewal Term was ending, Alpha and Tenant began negotiations to draft and execute the First Amendment to Lease Agreement ("Lease Amendment").[13] Alpha and Tenant executed the Lease Amendment on July 10,

---

[9]     *Id.*
[10]    *Id.* at JX0029.
[11]    Pl.'s Opening Br. Mot. for Summ. J. ("Pl.'s Opening Br.") ¶¶ 7-8, May 14, 2021 (D.I. 55).
[12]    *Id.*
[13]    Defs.' Opening Br. Mot. for Summ. J. ("Defs.' Opening Br.") at 7, May 14, 2021 (D.I. 56).

2019, three weeks before the Lease was set to expire.[14] The Lease Amendment modified the Lease in two ways. First, the Lease Amendment extended the length of the Lease by adding three additional five-year lease terms—the Extension Term, the Third Renewal Term, and the Fourth Renewal Term.[15] Second, the Lease Amendment set forth the base rent for each additional term.[16] Notably, the Lease Amendment contains the following language, "Except as expressly modified by this Amendment, the Lease remains in full force and effect in accordance with its terms."[17]

On July 25, 2019, CM issued an invoice to Alpha seeking to collect a commission of $47,184.25 under the Lease Amendment.[18] Alpha refused to remit payment claiming that the Extension Term was not a part of the original Lease and thus, not subject to the Commission Agreement.[19] CM sent Alpha a demand letter on September 13, 2019, seeking full payment of the commission.[20]

CM then filed a Complaint for the instant action on November 27, 2019.[21] Following discovery, both parties filed cross-motions for summary judgment on February 5, 2021.[22] This Court issued an order dated February 22, 2021, requiring, among other things, that both parties submit a joint appendix with all exhibits relied upon by the parties' respective briefs in support of their motions and held that the

---

[14] Joint App. at JX0052.
[15] *Id.*
[16] *Id.*
[17] *Id.* at JX0053.
[18] *Id.* at JX0059.
[19] *Id.* at JX0060.
[20] *Id.* at JX0061.
[21] D.I. No. 1.
[22] D.I. No. 41-42.

joint appendix "will be considered by the Court as one consolidated record to adjudicate the issues in dispute[.]"[23]

## II. PARTIES' CONTENTIONS

CM claims that Defendants breached the Commission Agreement by failing to pay CM a commission upon Tenant's execution of the Extension Term under the Lease Amendment. First, CM argues that the Commission Agreement's unambiguous language obligates Defendants to pay the commission. Second, CM argues that its past contractual relationship with Alpha supports its interpretation of the Commission Agreement.[24] Third, CM argues that the obligations under the Commission Agreement are triggered because the Lease never lapsed. Finally, and in the alternative, CM asserts a claim for unjust enrichment.

Alpha claims that CM's breach of contract claim fails for multiple reasons. First, Alpha asserts that CM may not recover additional commissions because CM was not the procuring cause of the Lease Amendment. Second, Alpha avers that the plain terms of the Commission Agreement require Alpha to only pay CM commissions on the three original lease terms found in the Lease. Third, Alpha argues that even if the Commission Agreement is ambiguous, it would not support CM's interpretation that commissions should be paid in perpetuity. Finally, Alpha claims that CM's unjust enrichment claim fails because the relationship between the parties is based on a valid contract.

---

[23] D.I. No. 44.

[24] Prior to a decision on the matter, it was agreed upon by both parties that the Court may not look to prior history and extrinsic evidence to rule upon these cross-motions. Therefore, the Court will not be addressing this contention. This is consistent with Delaware law, as the parties agree the terms of the contract terms at issue are not ambiguous. *Salamone v. Gorman*, 106 A.3d 354 (Del. 2014).

## III.  STANDARD OF REVIEW

When reviewing a motion for summary judgment under Rule 56, the Court must determine whether any genuine issues of material fact exist.[25]  The moving party bears the burden of showing that there are no genuine issues of material fact to be entitled to judgment as a matter of law.[26]  The Court will not grant summary judgment if it appears that there is a material fact in dispute or that further inquiry into the facts would be appropriate.[27]  In determining whether a genuine issue of material fact exists, the Court must view the facts in the light most favorable to the non-moving party.[28]

The standard for summary judgment is not altered when the parties have filed cross-motions for summary judgment.[29]  Cross-motions for summary judgment are not "*per se*" concessions that no genuine issue of material fact exists.[30]  "But, where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the [submitted record]."[31]

---

[25]  *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *3 (Del. Super. Ct. Oct. 28, 2020).

[26]  *Id.*

[27]  *Legion Partners Asset Mgmt., LLC v. Underwriters at Lloyds London*, 2021 WL 6621168, at *6 (Del. Super. Ct. Sept. 30, 2021).

[28]  *Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. Ct. Feb. 20, 2013).

[29]  *Legion*, 2021 WL 6622168, at *6.

[30]  *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[31]  *Radulski*, 2020 WL 8676027, at *4 (internal quotation marks omitted).

## IV. DISCUSSION: COUNT 1 BREACH OF CONTRACT

While the parties naturally disagree on a number of issues, the parties do agree that there are no issues of material fact that prevent a grant of summary judgment, and that no contract ambiguity exists. Simply because the parties disagree about the contract interpretation does not dictate a finding of ambiguity.[32] As such, the Court turns to the documents themselves for interpretation and to decide the ultimate issue: whether Plaintiff is owed a commission due to the Tenant and Alpha signing the Lease Amendment.

The Lease Amendment itself is telling, as it is a two (2) page document which, throughout, refers back to the original thirty-three (33) plus page Lease. In the first paragraph, the document states: "This first amendment to Lease Agreement (this "Amendment") is executed as of [July 10, 2019]…" In the next section, the parties Amendment states:

### RECITALS

A. [Alpha] and Tenant are parties to that certain Lease Agreement dated February 5, 2004 (the "Lease"), covering certain Premises located in the shopping center commonly known as Talleyville Shopping Center, located in Wilmington, Delaware (Dollar Tree Store No, 2817).

B. The Second Renewal Term expires July 31, 2019. Tenant desires to extend the Lease, and in connection with such extension, [Alpha] and Tenant have agreed to modify the Lease as set forth in this Amendment. …

1. <u>Lease Term, Renewal Term, and Base Rent</u>. The Lease is hereby amended (i) to provide that the term of the Lease shall be and is hereby extended for a period of five (5) years, commencing August 1, 2019 and expiring July 31, 2024 (the "Extension Term"), and (ii) by te grant

---

[32] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

to Tenant by Landlord of two (2) additional options to renew the term of the Lease, each for a period of five (5) years, the first commencing, if so exercised by Tenant, August 1, 2024 and expiring July 31, 2029 (the "Third Renewal Term"), and the second commenting, if so exercised by Tenant, August 1, 2029 and expiring July 31, 2034 (the "Fourth Renewal Term").[33]

The parties continue their language referencing and incorporating the original Lease in the very next sentence, which reads: "In recognition of the foregoing, Section A.10 of the Lease is hereby amended and restated in its entirety to read as follows…" at which point, they include the table setting forth the terms in the original Lease and simply add to it, including the new, agreed upon extension terms. Section 2 of the Lease Amendment states: "Tenant shall remain obligated to pay Additional Rent as set forth in the Lease." The Amendment continues to refer to the original Lease in sections 4, 6 and 7, where the defined terms are said to "have the same meanings ascribed to them in the Lease", the conflict section is stated "[t]o the extent the terms of this Amendment conflict with the terms of the Lease, the terms of this Amendment shall control" and finally, where it spells out that "Except as expressly modified by this Amendment, the Lease remains in full force and effect in accordance with its terms." Once again, Robert Stella signed the Amendment on behalf of Alpha.[34]

An integral part of CM's argument presupposes that the Lease Amendment is an amendment and not an entirely new lease. Conversely, Alpha maintains the Lease Amendment is a new lease. Alpha, however, also argues that it is immaterial whether the Lease Amendment is categorized as a new lease or an amendment to the

---

[33]    JX0052.
[34]    JX0053.

9

Lease, because it cannot be considered an option/renewal term exercised by the Tenant.

In fact, the crux of this decision on these cross motions depends on this very determination. As there is no question that Plaintiff was the procuring cause of the original Lease, and if the Amendment sufficiently relates back to the original Lease and is not deemed a new Lease in its entirety, then they seemingly are entitled to the disputed commission. If the Amendment is deemed to be a new lease entirely, then they may not be so entitled.

### A. THE LEASE AMENDMENT CONSTITUTES AN AMENDMENT TO THE LEASE

The question of whether the Lease Amendment constitutes a new lease requires the Court to not only interpret the language Lease Amendment, but to do so in conjunction with the other referenced documents.[35] In Delaware, a contract's proper interpretation is a question of law and is thus, ripe for decision on cross-motions for summary judgment.[36]

The Court finds that the Lease Amendment constitutes an amendment to the Lease and is not a "new" lease. In making this determination, "Delaware courts do not give any particular significance to the use of the words 'renew' or 'extend.'"[37] Instead, Courts infer the parties' intent based on the language of the lease.[38] The Court finds the language and guidance found in *Rehoboth Mall Ltd. Partnership v. NPC Intern., Inc.* controlling and most applicable to the situation at bar. In *Rehoboth Mall*, the Delaware Supreme Court found that a renewal provision, exercisable at the

---

[35] *Rehoboth Mall Ltd. Partnership v. NPC Intern., Inc.*, 953 A.2d 702, 704 (Del. 2008).
[36] *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).
[37] *Rehoboth Mall*, 953 A.2d at 704.
[38] *Id.*

option of the Tenant and provided for in the original lease, did not constitute a "new" lease because the provision expressly continued all rights and obligations under the original lease except for adjustments to the rental price.[39]  In doing so, the Court determined that the renewal provision provided for an automatic extension of the original lease without the need for executing a new lease.[40]  In contrast, in *Seaford Associates Ltd. Partnership v. Subway Real Estate Corp.*, the Delaware Court of Chancery found that a document titled "Lease Amendment and Extension" did constitute a new lease, however that was due to the extensive amount of substantive changes to the original lease that were included in the amendment, which essentially re-wrote the original lease.[41]

Here, the Lease Amendment modified Section A.10 of the Lease by adding three additional 5-year terms and the applicable rent rate for each term.  Unlike the purported amendment in *Seaford* which altered many of the terms of the underlying lease, the Lease Amendment stated that the Lease remains in full force and effect except as expressly modified.  Therefore, the Court finds the Amendment is just that – an amendment to the original Lease.  Given the very language included in the Lease Amendment, the original Lease is to apply with respect to all other terms, the Court finds that the Lease Amendment is not a new lease.

B.    **PROCURING CAUSE.**

Alpha argues, among other things, that CM is not the procuring cause of the Lease Amendment because it played no part in its negotiation or execution.  As such, Alpha claims the lease terms included in the Lease Amendment do not entitle CM

---

[39]    *Id.*

[40]    *Id.*

[41]    *Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp.*, 2003 WL 21254847, at *7 (Del. Ch. May 21, 2003).

to any future commissions. CM maintains that it is procuring cause of the Lease, and as such, it is entitled to commissions from the Lease Amendment.

The general rule of the procuring cause doctrine is that a broker is entitled to a commission if the broker "is the procuring cause of a consummated transaction."[42] To constitute procuring cause, a broker's efforts must bring the prospective tenant and landlord together and "lead directly to the consummation of the transaction."[43] Courts look to whether a broker's efforts "was the first link in a direct chain of causation leading to the consummation of the transaction, without a substantial break in the negotiations."[44]

Here, the Court finds that CM is the procuring cause of the Lease, and as a result, the Lease Amendment.[45] Again, because the Lease Amendment only modified the Lease, CM remains the procuring cause of the transaction. Accordingly, CM is the procuring cause of the Lease Amendment, and the Court will look to the Commission Agreement's plain language to determine whether CM is entitled to a commission.

### C.   BREACH OF CONTRACT FOUND

To bring a successful breach of contract claim, Plaintiff must prove there was: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting

---

[42]   *Nepa v. Marta*, 348 A.2d 182, 184 (Del. 1975).

[43]   *B-H, Inc. v. "Indus. Am.," Inc.*, 253 A.2d 209, 213-14 (Del. 1969).

[44]   *Id.* at 214.

[45]   *See Hursey Porter & Assocs. v. Bounds*, 1994 WL 762670, at *12 (Del. Super. Ct. Dec. 2, 1994) ("… a real estate broker's right to a commission should be governed by the provisions of the written listing agreement, not by the procuring cause doctrine."); *but see Stoltz Realty Co. v. Paul*, 1995 WL 654152, at *5-10 (Del. Super. Ct. Sept. 20, 1995) (applying procuring cause doctrine to three separate leases despite a written brokerage agreement between landlord and broker).

damages.[46]  When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement.[47]  "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[48]  Moreover, the Court may not interpret an agreement to add limitations "not found in the plain language of the contract."[49]  The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.[50]

The Court will interpret clear and unambiguous terms according to their ordinary meaning.[51]  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[52]  "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[53]  Rather, ambiguity exists "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or

---

[46]  *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005).

[47]  *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[48]  *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[49]  *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 746 (Del. 1997).

[50]  *E.I. du Pont,* 498 A.2d at 1113.

[51]  *Paul*, 974 A.2d at 145 (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[52]  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[53]  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

more different meanings."[54]  Where a contract is ambiguous, "the interpreting court may look beyond the language of the contract to ascertain the parties' intentions."[55] However, where ambiguity is found, summary judgment is inappropriate.[56]  For the following reasons, Court finds no ambiguity exists in the terms here, consistent with the parties contentions.

Here, the parties each rely upon various provisions in the Commission Agreement, Lease, and Lease Amendment to argue that the Commission Agreement is unambiguous and supports their respective interpretations.  As with any contract interpretation issue, the contract is to be read as a whole and interpreted as a reasonable person would, using an objective standard – as such, the language of the agreement(s) controls and requires a full analysis.

The Commission Agreement states, "Landlord shall pay CM **additional** commission(s) equal to five percent (5%) of the aggregate base rent for **each** option/renewal term for which the Tenant exercises."[57]  Section W.1 of the Lease addresses brokerage commissions and provides that the Commission Agreement controls such commissions.[58]  Section A.10 of the Lease sets forth three lease terms - the Original Lease Term, the First Renewal Term, and the Second Renewal Term.[59] Each term lasts five years, and pursuant to Section C.4 of the Lease, the Tenant has

---

[54]     *Eagle Indus.*, 702 A.2d at 1232.

[55]     *Id.*

[56]     *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783-84 (Del. 2012).

[57]     Joint App. at JX 0001 (emphasis added).

[58]     *See Id.* at JX0026.

[59]     *Id.* at JX0008.

the option to renew.[60]  Accordingly, all lease terms provided in Section A.10 are exercisable by the Tenant's option.

Section W.19 of the Lease provides that the Lease represents the entire agreement between the parties and that no modification to the Lease will be binding "unless reduced to writing and signed by them."[61]  The Lease Amendment, signed by both Alpha and the Tenant, modified only Section A.10 of the Lease by including three additional five-year lease terms—the Extension Term, the Third Renewal Term, and the Fourth Renewal Term.[62]  Additionally, the Lease Amendment states, "Except as expressly modified by this Amendment, the Lease remains in full force and effect in accordance with its terms."[63]

CM claims that the Commission Agreement's use of "additional" and "each" refers to all subsequent option/renewal terms, including those added in the Lease Amendment.  Moreover, CM maintains that the additional lease terms under the Lease Amendment are option/renewal terms exercisable by the Tenant because the Lease never lapsed and provides for "each succeeding Renewal Term(s)."[64]

Conversely, Defendants argue that the "additional" and "each" language found in the Commission Agreement refer only to the first three lease terms included in the Lease and claim that because the original Lease only identifies three lease terms, the Commission Agreement is limited only to the initial three terms. Defendants further assert that the Commission Agreement limits commissions to option/renewal terms exercised by the Tenant.  Defendants maintain that the Lease

---

[60]   *Id.* at JX0011, which states: "Landlord hereby grants to Tenant the option to renew this Lease for the periods stipulated in Section A.10."
[61]   *Id.* at JX0028.
[62]   *Id.* at JX0052.
[63]   *Id.* at JX0053.
[64]   *Id.* at JX0011.

15

Amendment was not exercised by the Tenant pursuant to any option found in the Lease. Instead, Defendants aver that the Lease Amendment was negotiated and agreed to without reference to the renewal terms under the original Lease.

To support their claim, Defendants also looks to Section C.4 of the Lease:

> Notice of election by Tenant to exercise each option shall be given to Landlord in writing at least six (6) months prior to the expiration of the then current term; provided, however, that **Tenant's right to exercise any option hereunder** shall not expire unless and until Landlord has given Tenant written notice of Tenant's failure to timely exercise its option.[65]

## D. IT IS REASONABLE TO INTERPRET THE LEASE AMENDMENT TO RELATE BACK TO THE COMMISSION AGREEMENT.

Both Plaintiff and Defendants contend that they have offered the only reasonable interpretation of the Commission Agreement, the Lease and Lease Amendment with respect to payment of additional commissions beyond those contemplated in the Lease. The Court finds that the Commission Agreement is unambiguous, and that Plaintiff's interpretation is the only reasonable interpretation of the Commission Agreement, the original Lease and the Lease Amendment.

Plaintiff's interpretation reconciles various provisions between the three documents. The contention that the Commission Agreement's use of the terms "additional" and "each" does not strictly limit commissions to the three option/renewal terms initially identified in the Lease is entirely reasonable when looking at the documents altogether. Courts interpret clear and unambiguous contract terms according to their ordinary meaning.[66] When parties do not define

---

[65] *Id.* (emphasis added).

[66] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013).

terms within the contract, Delaware courts may look to dictionaries to determine their plain meaning.[67]

The Commission Agreement obligates Defendants to pay commissions for "each option/renewal term for which the Tenant exercises."[68] CM and Alpha did not define the term "each" in the underlying documents. However, "each" has been defined as "being one of two or more distinct individuals having a similar relation and often constituting an aggregate."[69] Accordingly, the plain meaning of the Commission Agreement's terms does not solely bind the parties to the option/renewal terms found in the Lease.

Here, Alpha and Tenant amended Section A.10 of the Lease through the Lease Amendment. The Amendment added three additional lease terms to Section A.10 and expressly stated that all other terms of the Lease "remain in full force and effect in accordance with its terms."[70] Section C.4 of the Lease grants the Tenant "the option to renew this Lease for the periods stipulated in Section A.10."[71] As such, the Tenant has a right to exercise the option for the three new lease terms, and such terms continue to be subject to the Commission Agreement. Accordingly, Plaintiff's interpretation gives effect to all relevant provisions of the underlying documents and is reasonable.

Defendants maintain that the Commission Agreement's plain language limits payable commissions only to the lease terms found in the Lease. In support, they

---

[67] *Lorillard Tobacco Co. v. Am. Legacy Foundation*, 903 A.2d 728, 738 (Del. 2006).

[68] Joint App. at JX0001.

[69] *Each,* MERRIAM-WENSTER.COM, https://www.merriam-webster.com/dictionary/each (last visited Feb. 18, 2022).

[70] Joint App. at JX0053.

[71] *Id.* at JX0011.

cite this court's decision in *Silver Lake Office Plaza, LLC v. Lanard & Axilbund, Inc.* [72] In *Silver Lake*, the court addressed whether a commission agreement's plain language obligated the landlord to pay a broker commission on subsequent renewals of multiple leases after the commission agreement had expired.[73] The court held that the plain language of the commission agreement, specifically its use of the word "and" and "all" when referring to lease renewals and extensions of the lease, obligated the landlord to pay the disputed commissions.[74]

While *Silver Lake* addressed the reluctance of Delaware courts to enforce perpetual contracts, it determined that the brokerage agreement at dispute was not indefinite because its obligations would end when the landlord and tenant decided not to renew the agreement.[75] The court reasoned that a contract's potential long life is not "automatically fatal" and chose not to limit the broker's ability to collect commission when no such limit was "in the plain language of the contract."[76] The same is true here.[77]

The Commission Agreement's use of the word "each," like the word "all," does not expressly outline a limitation on which "option/renewal terms" fall under the scope of the Commission Agreement. Moreover, this Court cannot contradict a

---

[72] *Silver Lake Office Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378 (Del. Super. Ct. Jan. 17, 2014).
[73] *Id.* at *7-8.
[74] *Id.* at *7.
[75] *Id.* at *8.
[76] *Id.*
[77] Defendant also cites case law from various jurisdictions, arguing that a broker's right to collect commissions only applies to lease terms identified in the original lease, not subsequent extensions of the lease. The Court finds that the case law from different jurisdictions are legally and factually distinguishable from the case at hand, and are thus, unpersuasive.

contract's plain terms to add a limitation not expressly included by the parties.[78] Absent clear contract language to the contrary, the Court will not limit obligations due under the Commission Agreement solely because the contract has a potentially long life.

Defendants also argue that even if the Commission Agreement applied to the lease terms added by the Lease Amendment, those terms were not exercised by the Tenant through an option under the Lease. Defendants' argument, however, fails to consider the provisions of the Lease as a whole. The Lease Amendment modified Section A.10 and expressly stated that all remaining terms of the Lease apply in full effect.[79] Section C.4 of the Lease grants the Tenant the right to exercise an option to renew the Lease for all periods stipulated to in Section A.10.[80] Under a plain reading of the Commission Agreement, Lease, and Lease Amendment, this Court finds that the Tenant exercised an option under the Lease.

Accordingly, the Court finds that the only reasonable interpretation is that the Lease Amendment simply adds additional terms to the Lease and is an amendment to the original, and according to the plain meaning of all three documents, the Commission Agreement applies to the Amendment and Plaintiff is owed commission. As a result, Defendants' motion for summary judgment on this issue is **DENIED** and Plaintiff's motion for summary judgment is **GRANTED** as to Defendant Alpha.

---

[78] *Silver Lake*, 2014 WL 595378, at *7 (quoting *Rag Am. Coal Co v. AEI Res., Inc.*, 1999 WL 1261376, at *5 (Del. Ch. Dec. 7, 1999).

[79] Joint App. at JX0052-53.

[80] *Id.* at JX0011.

## V.    DISCUSSION: COUNT 2 UNJUST ENRICHMENT

Unjust enrichment has been defined by Delaware courts as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[81]  A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim.[82]  In other words, if "the contract is the measure of [a party's] right, there can be no recovery under an unjust enrichment theory independent of it."[83]  Thus, "[w]hen the complaint alleges an express, enforceable contract that controls the parties' relationship… a claim for unjust enrichment will be dismissed."[84]

Both parties agree that the Commission Agreement, Lease, and Lease Amendment are valid, binding contracts.  CM argues that the Commission Agreement obligates Alpha to pay CM a commission of $47, 184.25.  As such, the Commission Agreement measures CM's right to recover.  Both CM and Alpha assert that the documents in question control their relationship.  Therefore, CM cannot bring a claim for unjust enrichment in this action.  Accordingly, Defendant Alpha's motion for summary judgment concerning the unjust enrichment claim is **GRANTED**.[85]

---

[81]    *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[82]    *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[83]    *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979).

[84]    *Kuroda*, 971 A.2d at 891.

[85]    Because no arguments have been made with respect to FCS's involvement in these briefings, and the only contracts the Court has before it involves Defendant Alpha and not Defendant FCS, this ruling, once again, only applies to Defendant Alpha.

**VI.    CONCLUSION.**

Accordingly, with respect to Plaintiff's motion for Summary Judgment, it is **GRANTED** with respect to Defendant Alpha.  With respect to Defendant Alpha's motion for Summary Judgment, it is **DENIED** as to Count 1, and **GRANTED** as to Count 2.   The Court will allow future motions with respect to Defendant FCS and its involvement in this matter and potential liability.


IT IS SO ORDERED.

**/s/ Danielle J. Brennan**
The Honorable Danielle J. Brennan
