# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ITG BRANDS, LLC, )
          )
    Plaintiff, )
          )
    v. )
          )
REYNOLDS AMERICAN, INC. and )
R.J. REYNOLDS TOBACCO )
COMPANY, )
          )
    Defendants. )
          )    C.A. No. 2017-0129-LWW
REYNOLDS AMERICAN, INC. and )
R.J. REYNOLDS TOBACCO )
COMPANY, )
          )
    Counter-Plaintiffs, )
          )
    v. )
          )
ITG BRANDS, LLC, )
          )
    Counter-Defendant. )
          )

## MEMORANDUM OPINION

Date Submitted: November 6, 2024
Date Decided: March 3, 2025

Stephen C. Norman, Matthew F. Davis, & Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Elizabeth B. McCallum, Gilbert S. Keteltas, Carey S. Busen, & Evan M. Mannering, BAKER & HOSTETLER, LLP, Washington, D.C.; Jim W. Phillips, Jr. & Kimberly M. Marston, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP, Greensboro, North Carolina; Charles E. Coble, BROOKS, PIERCE, MCLENDON,

HUMPHREY & LEONARD, LLP, Raleigh, North Carolina; *Counsel for Plaintiff and Counterclaim Defendant ITG Brands, LLC*

Gregory P. Williams, Rudolf Koch, Robert L. Burns & Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Noel J. Francisco, C. Kevin Marshall & William D. Coglianese; JONES DAY, Washington, D.C.; Stephanie E. Parker & Katrina L.S. Caseldine, JONES DAY, Atlanta, Georgia; David B. Alden & Kevin P. Riddles; JONES DAY, Cleveland, Ohio; Elli Leibenstein, GREENBERG TRAURIG, LLP, Chicago, Illinois; Stephen L. Saxl, GREENBERG TRAURIG, LLP, New York, New York; Andrea Shwayri Ferraro, GREENBERG TRAURIG, P.A., West Palm Beach, Florida; *Counsel for Defendants and Counterclaim Plaintiffs Reynolds American Inc. and R.J. Reynolds Tobacco Company*

**WILL, Vice Chancellor**

This is the last of a series of opinions I have issued in this long-pending case, which brings the trial court chapter to a close. The matter involves ITG Brands, LLC's 2014 purchase of cigarette brands from R.J. Reynolds Tobacco Company under an asset purchase agreement. Before the purchase, Reynolds had reached a settlement with the State of Florida that required Reynolds to make payments to Florida in exchange for the release of claims about harms from smoking. After the purchase, ITG did not join the settlement agreement with Florida. Reynolds was later ordered by a Florida court to continue making payments under the Florida settlement agreement for sales of the cigarette brands ITG had purchased. Reynolds continues to pay Florida sizeable annual sums for the cigarette brands ITG owns and profits from.

My 2022 memorandum opinion concluded that the liability imposed on Reynolds by the Florida court was the sort that ITG had assumed in the asset purchase agreement, and that ITG's refusal to assume the liability was a breach of contract. My 2023 memorandum opinion addressed the remedial measure that Reynolds was entitled to for ITG's breach. This final memorandum opinion sets the amount of indemnification damages Reynolds is owed.

Quantifying Reynolds' damages was complicated by ITG's argument that they should be reduced by the amount Reynolds saved due to ITG's non-joinder to

1

the Florida settlement agreement. To simplify, ITG's non-joinder allows Reynolds to benefit from a favorable allocation of the payments it owes to Florida. At trial, both parties presented evidence on the amount of any offset that should apply to Reynolds' damages to account for this savings.

But the allocation is ultimately irrelevant. ITG was not found liable for failing to join the Florida settlement agreement. I did not hold that it breached any such obligation in the asset purchase agreement. ITG was, instead, found liable for failing to assume the liability imposed on Reynolds by the Florida court. ITG must make Reynolds whole for the entirety of that breach, which totals over $250 million (and counting).

## I.      ESSENTIAL FACTS

The background of this action is described in four Memorandum Opinions issued by the Court of Chancery on November 30, 2017, September 23, 2019, September 30, 2022 (the "2022 Liability Opinion"), and October 2, 2023 (the "2023 Remedies Opinion").[1] For the benefit of the reader, I recount the pertinent facts

---

[1] *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *1-5 (Del. Ch. Nov. 30, 2017) ("2017 Op."); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2019 WL 4593495, at *1-3 (Del. Ch. Sept. 23, 2019) ("2019 Op."); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2022 WL 4678868, at *1 (Del. Ch. Sept. 30, 2022) ("2022 Op."); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2023 WL 6383240, at *1-4 (Del. Ch. Oct. 2, 2023) ("2023 Op."). The first two decisions were issued by Chancellor Bouchard. The third and fourth decisions were issued by me.

below. Unless otherwise noted, the description that follows draws from the undisputed facts either contained in prior opinions, stipulated to by the parties, or proven by a preponderance of the evidence at trial.[2]

### A. The Florida Settlement Agreement

In 1995, R.J. Reynolds Tobacco Company ("Reynolds"), along with other cigarette manufacturers (with Reynolds, the "Settling Defendants"), entered into a settlement agreement with the State of Florida (the "Florida Settlement Agreement"). The Florida Settlement Agreement obligated the Settling Defendants to make annual payments to Florida in perpetuity in return for the dismissal, waiver, and release of certain claims brought by Florida for healthcare costs caused by smoking.[3]

Each annual payment had three components: (1) a base inflation-adjusted "Annual Payment"; (2) a "Volume Adjustment," which reduces (or increases) the Annual Payment if the current year aggregate volume is less (or more) than the 1997 base year; (3) a "Profit Adjustment," which applies only in the case of a negative

---

[2] Joint Pre-trial Stipulation and Order (Dkt. 430) ("PTO"). The trial record includes two days of live testimony from 2 expert witnesses and 602 joint exhibits. See Trial Tr. (Dkts. 448-49). Trial testimony is cited as "[Name] Tr." Facts drawn from exhibits jointly submitted by the parties at trial are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX __" unless otherwise defined. See Joint Ex. List (Dkt. 443 Ex. A).

[3] 2023 Op. *2.

Volume Adjustment and increases the Annual Payment if the aggregate net operating profit ("NOP") from domestic sales of cigarettes in the current year exceeds aggregate inflation-adjusted profits earned in the 1997 base year.[4] For each year, the aggregate amount is calculated and then allocated between the Settling Defendants.[5] The Annual Payment and Volume Adjustment are both allocated pro rata by the Settling Defendants' respective market shares, and the Profit Adjustment is allocated among the Settling Defendants based on the change in NOP compared to that of the inflation-adjusted 1996 base year.[6]

### B. The Asset Purchase Agreement and Florida Litigation

On July 15, 2014, ITG Brands, LLC purchased four cigarette brands (Winston, Salem, Kool, and Maverick—together the "Acquired Brands") from Reynolds.[7] The purchase closed on June 12, 2015 pursuant to an Asset Purchase Agreement (the "APA"). After the APA closed, neither ITG nor Reynolds made a

---

[4] *Id.* at *2-3.

[5] *Id.*

[6] The details of the allocation methodology for the Profit Adjustment are described at great length in Section II.A.2.a, *infra*. The Profit Adjustment may only be upward; to the extent the aggregate current year NOP has decreased relative to 1997 (inflation adjusted), the Profit Adjustment will be zero. Fla. Settlement Agreement Amend. No. 2 at App. A ¶ (B)(ii).

[7] 2022 Op. *2; 2023 Op. *3. As a technical matter, the transaction was between ITG and Reynolds' corporate parent, Reynolds American, Inc.

payment to Florida under the Florida Settlement Agreement for sales of the Acquired Brands.[8] ITG did not join the Florida Settlement Agreement at that point—or ever.

On January 18, 2017, Florida and Philip Morris, USA Inc.—another Settling Defendant—sued Reynolds and ITG in Florida state court to enforce the Florida Settlement Agreement with respect to the Acquired Brands.[9] In its August 15, 2018 final judgment (the "Florida Judgment"), the Florida court held that Reynolds was required to make annual settlement payments to Florida under the Florida Settlement Agreement for the sales of the Acquired Brands "unless and until ITG becomes a Settling Defendant."[10] The Florida Judgment expressly applied both to past-due Annual Payments and to future payments in perpetuity.[11]

The Florida Judgment mandated the methodology for calculating the payments due to Florida, accounting for ITG's status as the owner of the Acquired Brands and as a non-party to the Florida Settlement Agreement. The Florida Judgment provided that for the period after June 12, 2015, in perpetuity, "shipments of the Acquired Brands for domestic consumption shall be included in: (a) Reynolds'

---

[8] 2022 Op. *5; 2023 Op. *3.

[9] 2022 Op. *5.

[10] *Id.*; 2023 Op. *3.

[11] 2022 Op. *5; 2023 Op. *3. The court also ordered Reynolds to pay pre- and post-judgment interest on those past-due payments and Florida's "reasonable attorneys' fees and costs" from the 2017 Action. 2023 Op. *3.

portion of the Settling Defendants' aggregate volume on which the total Annual Payments are calculated . . . and (b) Reynolds' individual market share on which its pro rata share of the total Annual Payment is allocated."[12] The Florida Judgment also stated that, during this period:

> net operating profits from domestic sales of the Acquired Brands shall be included in: (a) Reynolds' Net Operating Profits for the 1996 and 1997 Base Years; (b) Reynolds' portion of the Settling Defendants' aggregate Actual Net Operating Profit for purposes of calculating the total amount of any profit adjustment owed in the Applicable Year pursuant to Appendix A of the 2001 Amendment, and (c) Reynolds' individual Actual Net Operating Profit in the Applicable Year for purposes of allocating among the Settling Defendants the total amount of any profit adjustment owed in that Applicable Year. ***No separate calculation is to be performed for ITG because ITG has no obligations under the Florida Settlement Agreement***.[13]

The Florida Judgment contemplated that the Profit Adjustment be calculated "as if the [APA] transaction with ITG Brands had not occurred."[14]

After the Florida Judgment was issued, Reynolds made several settlement payments to Florida in satisfaction of the liability it imposed (the "Florida Judgment

---

[12] JX 158 ("Fla. J.") ¶ 4.

[13] *Id.* (emphasis added).

[14] *Id.* ¶ 5.

Liability"). For the years 2015 through 2023, the amounts attributable to sales of

the Acquired Brands due to Florida are as follows:[15]

*Table 1: Reynolds' Payments Related to the Acquired Brands*

| Year | Payment Amount ($) | Fla. J. Interest ($) | Total ($) |
|---|---|---|---|
| 2015 | 15,055,786.30 | 4,122,957.59 | 19,178,743.89 |
| 2016 | 27,816,264.84 | 6,276,528.17 | 34,092,793.01 |
| 2017 | 27,973,497.48 | 4,871,440.37 | 32,844,937.85 |
| 2018 | 27,335,242.33 | 3,166,804.17 | 30,502,046.50 |
| 2019 | 26,189,284.60 | 1,294,580.70 | 27,483,865.30 |
| **Subtotal** | **124,370,075.55** | **19,732,311.00** | **144,102,386.55** |
| 2020 | 26,953,586.35 | - | 26,953,586.35 |
| 2021 | 27,036,206.33 | - | 27,036,206.33 |
| 2022 | 27,280,173.77 | - | 27,280,173.77 |
| 2023 | 26,122,175.02 | - | 26,122,175.02 |
| **Total** | **231,762,217.02** | **19,732,311.00** | **251,494,528.02** |

On October 5, 2020, Reynolds made the Annual Payments for 2015 through

2019, plus interest.[16] For each subsequent year, it made the Annual Payment when

due.[17] Additionally, on December 11, 2020 and June 18, 2021, Reynolds paid

---

[15] PTO ¶¶ 63-66. The October 2020 payment for past-due payments was inclusive of interest, but the end-of-year payments in 2020 through 2023 excluded interest since these payments were paid on the date the settlement payment was due. *See* 2023 Op. *4.

[16] 2023 Op. *4. The 2023 Remedies Opinion refers to the interest on these payments as the "Florida Judgment Interest."

[17] *Id.*

$3,235,000 in attorneys' fees and costs to Florida and outside counsel representing or retained by Florida (the "Florida Attorneys' Fees").[18]

## C.    Prior Delaware Rulings

ITG filed the present litigation in this court in February 2017, before the Florida Judgment was entered.[19]  The suit continued in fits and starts as related proceedings in other jurisdictions settled.  In time, the sole focus of this suit became the parties' obligations under the APA with respect to the Florida Settlement Agreement.

After Chancellor Bouchard resolved motions to dismiss and motions for judgment on the pleadings, the case came to me in 2021 on cross-motions for summary judgment.  The main issue presented was on liability—specifically, whether Reynolds or ITG was responsible for payments to Florida for sales of the Acquired Brands.  At that point, ITG had owned the Acquired Brands for seven years, but Reynolds continued to make sizeable Annual Payments to Florida under the Florida Judgment.

In my 2022 Liability Opinion, I concluded that the unambiguous terms of the APA provided that ITG had assumed the liability imposed by the Florida Judgment.

---

[18] *Id.*

[19] *See* Dkt. 1.

8

Specifically, APA § 2.01(c)(iv) contemplated that ITG would assume "all Liabilities (other than Excluded Liabilities) to the extent arising, directly or indirectly, out of the . . . use of the Transferred Assets, in each case from and after the closing."[20] The Florida Judgment Liability met the criteria of this provision. It (1) "ar[o]s[e], directly or indirectly, out of . . . the use of the Transferred Assets; (2) the use of the 'Transferred Assets' occurred 'from and after closing;' and (3) [it] was not an 'Excluded Liability.'"[21] "ITG's 'use of the Transferred Assets' to sell Acquired Brands cigarettes 'from and after Closing' is the basis for (and measure of) Reynolds'] liability under the Florida Judgment."[22] Accordingly, I held that Reynolds was entitled to indemnification under APA § 11.02(a)(iv) for the amounts it paid and would pay as a result of the Florida Judgment.[23] I reserved the decision on Reynolds' remedy for further proceedings.[24]

Reynolds then moved for summary judgment on remedies, seeking its payments to Florida due to the Florida Judgment Liability, the Florida Attorneys' Fees, fees in this litigation, and pre- and post-judgment interest.[25] In the same

---

[20] 2022 Op. *3 (quoting APA § 2.01(c)(iv)).

[21] *Id.* at *13-14 (quoting APA § 2.01(c)(iv)).

[22] *Id.* at *14.

[23] *Id.* at *19.

[24] *Id.* at *20.

[25] 2023 Op. *5.

motion, Reynolds also sought an order requiring ITG to either indemnify Reynolds for future payments to Florida or join the Florida Settlement Agreement.[26]

ITG both opposed Reynolds' arguments and cross-moved for summary judgment in its favor, asserting that the Florida Judgment Liability and Florida Attorneys' Fees were types of "Excluded Liabilities" under the APA and thus not indemnifiable.[27] With respect to the Florida Judgment Liability in particular, ITG argued that it was a "Straddle Tobacco Action Liability," which is defined in the APA as a "[l]iabilit[y] arising out of or in connection with any smoking and health-related Action . . . ."[28]

I resolved most of these issues in the 2023 Remedies Opinion.[29] I held that, understood in context, the Florida Judgment Liability did not meet the definition of

---

[26] Dkt. 335.

[27] 2023 Op. *5. In this motion, ITG also made various arguments in support of reducing its indemnification obligation, including an offset for the benefit Reynolds received from the Profit Adjustment allocation, and Reynolds' acquiescence, failure to mitigate, and material breach. It also opposed pre- and post-judgment interest. Dkt. 353.

[28] APA Ex. A at A-17 (emphasis added); *see also* APA § 2.01(d)(i) (defining "Seller Tobacco Liabilities").

[29] In addition to the cross-motions for summary judgment, in a subsequent letter opinion, I denied as untimely a motion to intervene brought by Philip Morris. *See ITG Brands, LLC v. Reynolds Am. Inc.*, 2024 WL 1366198, at *1 (Del. Ch. Apr. 1, 2024). In its motion, Philip Morris asserted that ITG's failure to join the Florida Settlement Agreement reduced the aggregate portion of the Profit Adjustment payment allocated to Reynolds and shifted the payment allocation onto Philip Morris. *Id.* Philip Morris sought to bring an unjust enrichment claim to recover the savings Reynolds incurred due to ITG's non-joinder. *Id.*

a Straddle Tobacco Action Liability. Consequently, the Florida Judgment Liability was an Assumed Liability indemnifiable under APA § 11.02(a)(vi).[30] I further held that the indemnifiable "Losses" (as defined in the APA) included pre- and post-judgment interest that Reynolds paid to Florida for past-due payments owed under the Florida Judgment, but did not cover the Florida Attorneys' Fees.[31] With respect to the Florida Attorneys' Fees, I also rejected Reynolds' alternative contractual argument that it incurred these fees in enforcing its rights under the APA, and concluded that the Florida Attorneys' Fees were incurred by Florida in enforcing the Florida Settlement Agreement.[32] Finally, I rejected several of ITG's arguments for reducing the damages it owed to Reynolds. Specifically, I held that Reynolds'

---

[30] 2023 Op. *6. I held that this argument was both waived (since it was not sufficiently raised until the brief opposing Reynolds' motion for summary judgment) and failed on the merits. *Id.* at *7-8. On the merits, I held that "smoking and health-related," though not expressly defined in the APA, was used consistently in the context of allocating liabilities that arose during different time periods. *Id.* at *10-11. Given this context, I determined that the term's use within the definition of the "Straddle Tobacco Action Period" was best read to refer to latent health problems related to smoking that arose from conduct pre-closing but for which the associated claim was filed post-closing. *Id.* at *13. This meaning is far narrower than the expansive one ITG advanced, in which "smoking and health-related" meant *any* "connection to smoking and health." *Id.* at *9.

[31] I noted that the definition of Losses "explicitly includes 'interest and penalties recovered by a third party' (like Florida), but not third-party attorneys' fees," and concluded that such enumeration without the inclusion of other more general words indicates the exclusion of non-enumerated terms. *Id.* at *14. But I held that the interest on the Florida Judgment payments "[fell] squarely within" the enumerated terms included in the definition, as an "interest [or] penalt[y] recovered by a third party." *Id.* at *15.

[32] *Id.* at *14.

11

purported breaches of the APA did not preclude indemnification, [33] and that Reynolds' recovery was neither barred by the doctrine of acquiescence,[34] nor limited by Reynolds' purported failure to mitigate ITG's losses.[35]

I left three issues for resolution after trial. First, I did not reach ITG's argument that Reynolds' damages should be offset by the favorable Profit Adjustment Reynolds enjoyed due to ITG's failure to join the Florida Settlement

---

[33] ITG had argued that Reynolds failed (1) to assist ITG in reaching an agreement with Florida, (2) to keep ITG informed of and ensure ITG's participation in discussions regarding ITG's joinder of the Settlement Agreement, and (3) to use "reasonable best efforts" in obtaining the necessary third-party consents for ITG's assumption of settlement obligations. *Id.* at *19. I did not reach these arguments on the merits because I found that ITG was obligated to "pay, discharge, and perform" all "Assumed Liabilities" under the APA "effective as of the Closing" of its purchase of the Acquired Brands and all of Reynolds' purported breaches occurred after this date. *Id.* at *20.

[34] I explained that Reynolds at most acquiesced in ITG's interpretation of APA § 2.01(c)(vii), and that acquiescence in an idea rather than an act was insufficient to bar recovery as a matter of law. *Id.* at *20. I also concluded that ITG had not met the required elements of an acquiescence defense since it failed to show that Reynolds "remain[ed] inactive for a considerable time," "freely [did] what amounts to recognition of the complained of act," or "act[ed] in a manner inconsistent with subsequent repudiation." *Id.* at *20-22.

[35] ITG argued that Reynolds disabled ITG's joinder to the Florida Settlement Agreement by choosing a base year for the calculation of the Annual Payment that triggered Philip Morris's objections and the subsequent 2017 litigation. *Id.* at *22. I determined that this accusation—to the extent it may be disaggregated from the Profit Adjustment issue resolved later in this opinion—was deficient as a matter of law both temporally and because it pertains to the wrong breach. ITG's breach in question was the failure to assume its liabilities under the APA—not failure to join the Florida Settlement Agreement. *Id.* Further, mitigation "generally arises *after* breach"; the duty to mitigate does not require a defendant to go back in time and act differently to prevent a breach from happening in the first place. *Id.* (citing *NASDI Hldgs., LLC v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at *7 (Del. Ch. Apr. 8, 2019), *aff'd*, 276 A.3d 463 (Del. 2022)).

12

Agreement.[36]  Second, due to deficient briefing, I did not resolve whether attorneys'

fees and costs Reynolds paid in this litigation (the "Delaware Attorneys' Fees") fell

within the definition of "Seller Plaintiff Fees"—a type of "Excluded Liability" under

the APA.[37]  Finally, I reserved the issue of pre- and post-judgment interest until I set

the damages award itself.[38]

Trial on the first two of these issues was held on July 8 and 9, 2024.  Post-trial

argument was heard on November 6,[39] after which I took the matter under

advisement.

## II.    LEGAL ANALYSIS

My prior decisions held that because the Florida Judgment Liability is an

Assumed Liability, ITG must indemnify Reynolds under APA § 11.02(a)(vi) for its

related payments to Florida.[40]  Reynolds seeks indemnification of approximately

---

[36] *Id.* at *17-18 (reserving this issue for after trial).

[37] Although I found further argument necessary to resolve this issue, I rejected ITG's argument that because Reynolds had not requested a precise amount of fees, it had effectively waived this claim.  *Id.* at *16.  As I explained, it is common practice to file a Rule 88 affidavit after the court determines a party's entitlement to fees, after which the other party may dispute the reasonableness of such fees.  *Id.*

[38] *See* 2023 Op. *23 & n.187.

[39] Dkts. 442, 448-49, 467, 470.

[40] *See* 2022 Op. *19; 2023 Op. *18-19.

13

$251.5 million, which is the additional amount of sales-based payments Reynolds has made to Florida to date because of the Florida Judgment.[41]

ITG, for its part, insists that Reynolds' damages should be reduced by the amount Reynolds saved from the Profit Adjustment allocation due to ITG's non-joinder to the Florida Settlement Agreement. This position has some facial appeal. Upon further examination, however, it is plainly inconsistent with the indemnification damages owed to Reynolds for the breach found in the 2022 Liability Opinion. I therefore decline to offset Reynolds' damages as ITG proposes.

I also conclude that Reynolds is not entitled to indemnification for the Delaware Attorneys' Fees. But I award Reynolds pre- and post-judgment interest on its indemnification award.

## A. Reynolds' Indemnification Damages for Its Losses

ITG does not presently dispute that, based on my decisions to date, it must indemnify Reynolds for the Annual Payment and the Volume Adjustment. It argues, however, that Reynolds' recovery should be reduced by the millions of dollars in Profit Adjustment payments Reynolds saved because of ITG's non-joinder to the

---

[41] *See supra* note 15, tbl. 1, and accompanying text.

14

Florida Settlement Agreement. According to ITG, Reynolds would receive a windfall if these savings were not deducted from Reynolds' damages.[42]

There is some logic to ITG's argument, at first blush. As I recognize below, ITG's non-joinder to the Florida Settlement has meant that Reynolds pays comparatively less to Florida than if ITG had joined. ITG advances an approach to calculating its liability here that would offset Reynolds' damages by the amount of Reynolds' savings under the Profit Adjustment (between $693 and $959 million) using a more favorable base year (in which Reynolds received credit for the Acquired Brands).[43]

There is a fundamental problem with ITG's argument, however. It centers the wrong harm. ITG presumes that the relevant breach is its failure to join the Florida Settlement Agreement. But I did not find that ITG breached any such obligation. I held only that it failed to assume the Florida Judgment Liability under APA § 2.01(c)(iv).[44]

This is a critical distinction. Under black letter law, Reynolds must be restored to the status it held before ITG's breach of the APA for failure to assume the Florida Judgment Liability. Since the relevant breach is unrelated to ITG's non-

---

[42] *See* ITG's Post-trial Opening Br. (Dkt. 455) 19-20.

[43] *Id.* at 21-22.

[44] 2023 Op. *22.

joinder to the Florida Settlement Agreement, Reynolds' remedy need not account for a hypothetical world in which ITG became a party to that settlement. Reynolds is entitled to its actual losses caused by the imposition of the Florida Judgment Liability, which ITG failed to assume. Reynolds' savings from a favorable Profit Adjustment are irrelevant to remedying that harm.[45]

### 1. Reynolds' Damages

In the 2022 Liability Opinion, I held that the Florida Judgment "is an Assumed Liability under § 2.01(c)(iv) of the APA."[46] I subsequently held in the 2023 Remedies Opinion that "Reynolds is entitled to indemnification for the Losses associated with the Florida Judgment Liability based on ITG's sales of the Acquired Brands' cigarettes."[47] The scope of Reynolds' damages is plainly defined by the text of the APA and confirmed by Delaware law, which governs the APA.[48]

---

[45] *See infra* note 69 and accompanying text (explaining the motivation behind the different numbers offered by the parties). While the uncertainty inherit in this calculation is not on its own dispositive, it does underscore the difficulty in awarding speculative damages awards.

[46] 2022 Op. *19.

[47] 2023 Op. *23.

[48] APA § 12.12(a) (providing that Delaware law governs the APA). "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). A court will not look beyond the four corners on an agreement if a contract is unambiguous. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person

16

### a.    The APA

Section 11.02(a)(vi) of the APA sets out Reynolds' indemnification right. It requires that ITG indemnify Reynolds for "all Losses that [Reynolds] may suffer or incur, or become subject to, as a result of . . . any Assumed Liability."[49] "Losses" are broadly defined in the APA to include "all losses, . . . damages, deficiencies, fines, penalties, costs, expenses, commitments, judgments, [and] orders."[50] To "incur" a loss means "[t]o suffer," as in "a liability or expense."[51] "Suffer" includes "experienc[ing] or sustain[ing]" an "injury" such as "damages."[52] And "as a result" means "[a] consequence, effect, or conclusion."[53]

---

in the position of either party would have no expectations inconsistent with the contract language."); 2019 Op. at *4 ("Clear and unambiguous language . . . should be given its ordinary and usual meaning." (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006))). Ambiguity exists if "the provisions in controversy are fairly susceptible of different interpretations." *Eagle Indus.*, 702 A.2d at 1232.

[49] APA § 11.02(a)(vi). Notably, ITG omits any substantive citation to § 11.02(a)(vi) in its briefing.

[50] *Id.* at A-10.

[51] *Incur*, Black's Law Dictionary (11th ed. 2019); *see Lorillard*, 903 A.2d at 738 ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); *see also O'Brien v. IAC/Interactive Corp.*, 2010 WL 3385798, at *7 (Del. Ch. Aug. 2, 2010) (explaining that a party incurs a liability when it is "obligated to pay that amount").

[52] *Suffer*, Black's Law Dictionary (11th ed. 2019).

[53] *Result*, Black's Law Dictionary (11th ed. 2019); *see also S'holder Rep. Servs. LLC v. Shire US Hldgs., Inc.*, 2020 WL 6018738, at *25 (Del. Ch. Oct. 12, 2020) ("The plain meaning of the phrase 'as a result' is 'because of something.'").

17

Because the Florida Judgment is an Assumed Liability, the APA requires ITG to indemnify Reynolds for the "Losses" Reynolds incurred because of the Florida Judgment.[54] Calculating this amount is straightforward. The Florida Judgment holds that "Reynolds is liable to make Annual Payments to [Florida] under the Florida Settlement Agreement for sales of cigarettes under the [Acquired Brands] it transferred to ITG . . . with respect to the period after June 12, 2015, in perpetuity."[55] It specifies that "settlement payments must be calculated as if [Reynolds'] transaction with ITG Brands[, i.e., the purchase of the Acquired Brands] had not occurred."[56] It further confirms that "[n]o separate [Profit Adjustment] calculation is to be performed for ITG because ITG has no obligations under the Florida Settlement Agreement."[57]

Thus, Reynolds' damages are all Losses it incurred because of the Florida Judgment Liability. The Florida Judgment contemplates that Reynolds must pay Florida based on ITG's sales of the Acquired Brands as though Reynolds continued

---

[54] *See* 2022 Op. *19 (observing that "the amounts Reynolds Tobacco has paid (and will pay) due to the Florida Judgment are Losses for which ITG must indemnify Reynolds").

[55] Fla. J. ¶ 4.

[56] *Id.* ¶ 5.

[57] *Id.* ¶ 4.

to own them.  ITG therefore owes Reynolds damages based upon what Reynolds paid to Florida under the Florida Judgment.

> b.    Delaware Law

Under settled principles of Delaware law, an indemnification obligation—like that due to Reynolds from ITG—is owed "by one party to make another whole for a loss that the other party has incurred."[58]  This is an extension of contract law.[59]  The standard remedy for a breach of contract is expectation damages, which are "designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed."[60]  Indemnification "operates to fully shift the loss from the party incurring it . . . to the party whose

---

[58] 41 Am. Jur. 2d Indemnity § 1 (1968); *see also Christiana Care Health Servs. Inc. v. Carter*, 223 A.3d 428, 431 n.7 (Del. 2019) (citing 41 Am. Jur. 2d Indemnity § 3 (1968)); *see also Indemnity*, Black's Law Dictionary (11th ed. 2019) (defining "indemnity" as "[a] duty to make good any loss, damage, or liability incurred by another").

[59] Delaware courts conceptualize indemnification obligations as equivalent to damages for breach of contract.  *See Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *4 (Del. Ch. Jan. 31, 2013) (assessing damages for breach of an indemnification provision using the standard approach for breach of contract damages); *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *3 (Del. Ch. Jan. 24, 2005) ("The term 'Indemnification' is used here as a contractual term of art to describe [a] contractual remedy."); *see also IFC Interconsult, AG v. Safeguard Int'l P'rs, LLC*, 438 F.3d 298, 319 (3d Cir. 2006) (same); 42 C.J.S. Indemnity § 10 ("The general rules which govern the construction and interpretation of other contracts apply in construing a contract of indemnity and in determining the rights and liabilities of the parties thereunder.").

[60] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009); *see also Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) ("Th[e] principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract.").

negligence was 'the primary cause of the injured party's harm.'"[61] Doing so puts the indemnitee in "as close as possible to the same position [it] was in before the injury."[62]

Applied here, the enforcement of § 11.02(a)(vi) should restore Reynolds to the status quo ante—the position it occupied before ITG injured Reynolds by failing to assume the Florida Judgment Liability. Before Reynolds' injury, Reynolds made payments to Florida based on the sales volume of cigarette brands that *Reynolds* owned. It made no payments to Florida based on ITG's sales of the Acquired Brands cigarettes. Reynolds was injured when ITG refused to assume the Florida Judgment Liability, causing Reynolds to make ongoing payments to Florida for sales of the Acquired Brands cigarettes. Indemnification for this harm is unconcerned with the position Reynolds might have occupied if ITG had joined the Florida Settlement Agreement.

---

[61] 41 Am. Jur. 2d Indemnity § 1 (1968) (explaining that indemnification "is based on the principle that everyone is responsible for his or her own wrongdoing, and if another person has been compelled to pay a judgment which ought to have been paid by the wrongdoer, then the loss should be shifted to the party whose negligence or tortious act caused the loss").

[62] *LCT Cap., LLC v. NGL Energy P'rs LP*, 249 A.3d 77, 91 (Del. 2021) (citation omitted).

### c. Damages Owed to Reynolds

For each year after the APA closed, Reynolds has been responsible for payments to Florida not only for sales of its own cigarettes (as before the Florida Judgment) but also for ITG's sales of Acquired Brand cigarettes (due to the Florida Judgment Liability and ITG's refusal to assume it). As of December 31, 2023, the sum Reynolds has paid to Florida for ITG's sales of the Acquired Brands totals $251.5 million[63]—and will grow in perpetuity. Restoring Reynolds to the status quo ante requires ITG to reimburse Reynolds for the payments it made to Florida, effectively on ITG's behalf, because of the Florida Judgment Liability.

### 2. ITG's Claimed Offset

With the concept of making the injured party whole comes the corollary principle that expectation damages should not overcompensate. That is, any benefit the injured party obtains from the breach should be subtracted from its total losses to avoid a windfall.[64] The Restatement (Second) of Contracts explains that if the "breach itself results in a saving of some cost that the injured party would have incurred if he had had to perform," these avoided costs are deducted from the

---

[63] *See supra* note 15, tbl. 1, and accompanying text.

[64] *Paul*, 974 A.2d at 146 (citation omitted).

measure of damages.[65]  That is, expectation damages are measured "by the losses caused and gains prevented by defendant's breach."[66]

Based upon this principle, ITG argues that Reynolds' indemnity award must be offset by the amount Reynolds saved due to ITG's non-joinder to the Florida Settlement Agreement.  To gain insight into ITG's argument, it is helpful to first explain how ITG's failure to join the Florida Settlement Agreement shifted the allocation of the Profit Adjustment in Reynolds' favor.  After doing so, I address why ITG's approach is irrelevant to calculating Reynolds' indemnifiable losses and would lead to an absurd result.

### a.    The Profit Adjustment Allocation

All else being equal, if a Settling Defendant has a higher 1996 base year NOP, that Settling Defendant's change in NOP is lower and it pays a smaller proportion of the Profit Adjustment.  Because the Florida Judgment calculates the Profit Adjustment allocation "as if the transaction with ITG Brands had not occurred," it assigns the Acquired Brands' base year NOP to Reynolds.[67]  If ITG were to join the Florida Settlement Agreement, the Acquired Brands' base year NOP would be

---

[65] Restatement (Second) of Contracts § 347 (1981) cmt. d.

[66] *Paul*, 974 A.2d at 146-47 (quoting *ATACS Corp. v. Trans World Commc'ns., Inc.*, 155 F.3d 659, 669 (3d Cir. 1998)).

[67] Fla. J. ¶ 5.

deducted from Reynolds' ledger and assigned to ITG's. This smaller base year NOP would mean that Reynolds paid a relatively larger proportion of the Profit Adjustment.

In general, the higher the value of the Acquired Brands' base-year inflation-adjusted NOP,[68] the more Reynolds benefits—i.e., the smaller the portion of the Profit Adjustment it must pay—because of ITG's non-joinder. But, if ITG joined the Florida Settlement Agreement, the value of the Acquired Brands' base-year inflation-adjusted NOP would be lower, and the portion of the Profit Adjustment allocated to Reynolds would be correspondingly smaller. Because these forces cut in opposite directions, there is a "goldilocks" number at which Reynolds benefits the most from ITG's non-joinder.[69]

### b. The Profit Adjustment Allocation's Irrelevance

Reynolds acknowledges that it has enjoyed savings from the Profit Adjustment allocation as a result of ITG's non-joinder to the Florida Settlement

---

[68] The inflation adjustment for 2021 is 222.13%.

[69] I suspect that this feature motivated the parties to submit different calculations for the 1996 base-year NOP of the Acquired Brands. Because I conclude that Reynolds' damages are not reduced by any amount of the Profit Adjustment attributable to ITG's non-joinder, I do not reach either party's argument regarding the correct 1996 base-year NOP figure.

Agreement.[70]  Using its own preferred base-year profits figure of $693,182,000.00 for the Acquired Brands, Reynolds stipulated to a savings of $112,818,991.76 from 2015 through 2023.[71]  The benefit to Reynolds from ITG's non-joinder is also evident when comparing the Profit Adjustment allocation in the Florida Settlement Agreement with similar allocations in other state settlements where ITG was a party. For example, in 2018, Reynolds was allocated 90% of the profit component of a settlement in Mississippi, where profits from the Acquired Brands were accounted for separately because ITG is a party, but Reynolds was allocated none of the profit component in calculating its Florida settlement payments in the same year.[72]

According to ITG, this savings must be subtracted from Reynolds' indemnification damages.[73]  ITG cites to Delaware precedent confirming that "the value of the loss must be reduced by any cost or other loss avoided by the

---

[70] 2022 Reynolds 30(b)(6) Dep. 226-30 & Ex. 39 (Reynolds internal calculation showing that for 2016 Reynolds' profit-related payments would increase by $69 million if ITG joined PSS settlements); 2017 Reynolds 30(b)(6) Dep. 466-68.

[71] PTO ¶ 70.

[72] JX 259 ¶ 30; *see also* Lam Tr. 369-373; JX 310.

[73]  ITG's Post-trial Opening Br. 19-26.

non-breaching party."[74] A failure to subtract this savings, ITG insists, would confer an impermissible windfall upon Reynolds.[75]

ITG's argument assumes that the relevant breach is its non-joinder to the Florida Settlement Agreement. If that were so, Reynolds would arguably be entitled to the difference between the scenario where ITG had joined the settlement (i.e., had not breached) and the actual scenario where ITG did not join (i.e., had breached). Critically, however, ITG had no duty to join the Florida Settlement Agreement. ITG had an obligation in the APA to exercise reasonable best efforts to join the Florida Settlement, but that provision is unrelated to the breach of the APA for which ITG was found liable to Reynolds.

The 2022 Liability Opinion held that ITG breached the APA by failing to assume the Florida Judgment Liability as an Assumed Liability.[76] As the 2023

---

[74] *Id.* at 16-17 nn.64-65 (citing *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009) ("[T]he value of the loss must be reduced by any cost or other loss avoided by the non-breaching party . . . .") and *WaveDivision Hldgs., LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *19-20 (Del. Ch. Sept. 17, 2010) ("Wave is only entitled to recover the net loss it has suffered because of Millennium's breach.")); *see also Murphy Marine Servs. of Del., Inc. v. GT USA Wilmington, LLC*, 2022 WL 4296495, at *18 (Del. Ch. Sept. 19, 2022) (explaining that "any damages awarded to the plaintiffs must be reduced . . . to ensure the plaintiffs do not receive a 'windfall' from [the defendant's] breach").

[75] ITG's Post-trial Opening Br. 17-18; *see, e.g.*, *Paul*, 974 A.2d at 146 (stating that contract damages "should not act as a windfall").

[76] 2022 Op. *19.

Opinion confirmed, the only breach at issue is "ITG's refusal to indemnify Reynolds for the Florida Judgment Liability"—not ITG's non-joinder.[77] Thus, though ITG's arguments may draw upon settled notions of expectation damages, they have no relevance to this indemnity dispute. The sole measure of recovery is the "actual payment [that] has been made by the" indemnitee.[78] That is precisely what the parties bargained for in the APA.[79]

### c. Perverse Incentives

The fact that ITG's argument assumes the wrong breach is sufficient to dispose of it. A further wrinkle is worth noting. ITG would receive an unfair advantage if I were to reduce Reynolds' damages by an estimate of the Profit Adjustment allocation that assumes ITG joined the Florida Settlement Agreement. ITG would not only avoid being bound by the Florida Settlement Agreement, but also realize the benefit of a Profit Adjustment offset as though it had. Perverse incentives would result.[80]

---

[77] 2023 Op. *22.

[78] 25 Williston on Contracts § 66:108.

[79] *See supra* Section II.A.1.a.

[80] Delaware courts often consider the policy implications of their legal interpretations. *See, e.g.*, 2017 Op. *12 (noting that ITG's read of APA suggested that its obligation to use reasonable best efforts to join the Florida Settlement Agreement terminated after it purchased the Acquired Brands "would have the nonsensical result of incentivizing [it] to stall its discussions with Florida until after the [c]losing of the transaction in order to avoid making annual payments tied to its *own sales* of cigarette products"); *see also Manti Hldgs,*

26

To reduce Reynolds' damages as though ITG joined the Florida Settlement Agreement would disincentive ITG from ever doing so. ITG would continue to own the Acquired Brands and receive profits for their sales. Reynolds would continue to pay Florida for ITG's sales of the Acquired Brands cigarettes pursuant to the Florida Judgment. And ITG would obtain a reduction to the indemnification damages it owes Reynolds for failing to assume the Florida Judgment Liability. This result would be contrary to the very letter and spirit of the APA.

If ITG wishes to benefit from the Profit Adjustment allocation, it has a solution: it may join the Florida Settlement Agreement. Its position in this litigation would give it no incentive to do so. Applying a $693,182,000 base year for the NOP

---

*LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (explaining that Delaware courts reject contractual interpretations that "produce[] an absurd result" or a result that "no reasonable person would have accepted when entering the contract" (citing *Osborn*, 991 A.2d at 1160)); *cf. Genuine Parts Company v. Cepec*, 137 A.3d 123, 140-41 (Del. 2016) (concluding that compliance with the Delaware's corporate registration statute should not confer general jurisdiction to "avoid[] the perverse result of subjecting foreign corporations that lawfully do business in Delaware to an overreaching consequence . . . that does not apply to foreign corporations that do business in Delaware without properly registering and are only subject to specific jurisdiction in Delaware under [8 *Del. C.* ]§ 382"); *Sunder Energy, LLC v. Jackson*, --- A.3d ---, 2024 WL 5052887, at *12 (Del. Dec. 10, 2024) (rejecting an argument that an overly restrictive non-compete covenant should be "blue penciled" on the grounds that doing so would create perverse incentives for employers in drafting such covenants); *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 534-25 (Del. Ch. 1998) (holding that litigants previously denied equitable relief due to unclean hands cannot avoid the outcome of a judgment by attempting to undo that conduct after judgment since it would encourage unscrupulous litigants to undertake "questionable conduct" ex ante knowing they can "neutralize[]" the effect ex post).

calculation, Reynolds' allocation of the Profit Adjustment—for which ITG was required to partially indemnify it for the portion corresponding to the Acquired Brands—would have been $303,864,842 had ITG joined the Florida Settlement Agreement.[81] This is $112,818,992 more than it actually paid since ITG did not join.[82] Thus, if Reynolds' indemnification award were reduced based on its savings from ITG's non-joinder, ITG would continue to reap millions of dollars in savings annually without being bound by the Florida Settlement Agreement.

## B.    Reynolds' Delaware Attorneys' Fees and Costs

Reynolds sought indemnification for both $3,235,000 in Florida Attorneys' Fees and $7,400,000 in Delaware Attorneys' Fees.[83] In the 2023 Remedies Opinion, I held that the Florida Attorneys' Fees were not indemnifiable Losses under the APA.[84] I reserved for trial the question of whether Reynolds was entitled to the Delaware Attorneys' Fees.[85] I take up that issue now.

---

[81] PTO ¶ 70.

[82] *Id.*; *see also supra* note 72 and accompanying text.

[83] *See supra* notes 18, 37, and accompanying text (defining Florida Attorneys' Fees and Delaware Attorneys' Fees, respectively).

[84] 2023 Op. *14-15.

[85] *Id.* at *17. I did, however, dismiss on summary judgment ITG's argument that Reynolds had waived its claim by arguing that it was entitled to Delaware Attorneys' Fees before producing evidence of the specific amount to which it was entitled. *See supra* note 37.

ITG avers that it need not indemnify Reynolds for the Delaware Attorneys' Fees because they are "Seller Plaintiff Fees"—a type of Excluded Liability under APA § 2.01(d)(ix).[86] Seller Plaintiff Fees are defined as "all plaintiffs' attorneys' fees and other legal costs in relation to the State Settlements in respect of the Acquired Tobacco Cigarette Brands, relating to any periods, whether before, on, or after the Closing Date excluding, for the avoidance of doubt, Assumed Plaintiff Fees."[87]

The Delaware Attorneys' Fees fit comfortably within the definition of Seller Plaintiff Fees. Reynolds is a "Seller."[88] With regard to the indemnification claims, Reynolds has been in the "posture of the plaintiff."[89] Additionally, Reynolds' indemnification claim is "in relation to the State Settlements" and "in respect of the

---

[86] ITG's Pre-trial Br. (Dkt. 424) 54-58.

[87] APA at Ex. A.

[88] JX 89 (APA Recital B).

[89] *See* Defs.' Reply Br. in Supp. of Mot. for Summ. J. on Remedies and Answering Br. in Opp'n to ITG's Mot. for Summ. J. on Remedies (Dkt. 353) ("Reynolds' Summ. J. Reply Br.") (Dkt 353) 48. There is no reason to distinguish between counter-plaintiffs and plaintiffs for this purpose. *See* Ct. Ch. R. 55(d) ("The provisions of this rule apply whether the party entitled to the judgment by default is a plaintiff, a third-party plaintiff, or a party who has pleaded a cross-claim or counterclaim."); Ct. Ch. R. 56(a) ("A party seeking to recover upon a claim, counter claim, cross-claim or declaratory judgment may" seek summary judgment). Reynolds does not meaningfully dispute ITG's general contention that Reynolds as counter-plaintiff was acting as the plaintiff for the purpose of its indemnification claim. *See* Reynolds' Pre-trial Br. (Dkt. 428) 44.

[Acquired Brands]."[90]   The Delaware Attorneys' Fees are therefore Excluded Liabilities and not indemnifiable.

Reynolds raises two arguments otherwise.  Both are unavailing.

First, at the summary judgment stage, Reynolds argued that the phrase "plaintiffs' attorneys' fees" as used in the definition of Seller Plaintiff Fees refers to "private outside counsel who represented the States as plaintiffs in the underlying lawsuits leading to the state settlements."[91]   In the 2023 Remedies Opinion, I observed that Reynolds improperly based this argument on a fee payment arrangement in the Florida litigation, which was outside the record in this case.[92] Reynolds' pre-trial brief continues to reference that fee payment arrangement and argues that it is incorporated into the record—even if the parties failed to clearly identify it previously.[93]

Reynolds makes an intricate contractual argument that the term Seller Plaintiff Fees refers only to fees paid to certain private outside counsel.  Key to Reynolds' argument is the fact that Seller Plaintiff Fees are expressly defined to

---

[90] *See supra* note 87 and accompanying text.

[91] Reynolds' Summ. J. Reply Br. 46-47.

[92] 2023 Op. *17.

[93] *See* Reynolds' Pre-trial Br. 45 n.6.

"exclude[] . . . Assumed Plaintiff Fees"—another defined term in the APA[94]—such that these terms "inform one another's meaning."[95] Reynolds contends that the definition of Assumed Plaintiff Fees refers to the Florida fee payment arrangement, which identifies private counsel authorized to receive fees related to the Florida litigation and allocates fees to that counsel "pro rata in proportion to their Market Shares," defined in terms of aggregates sales volumes over a specified period.[96] Reynolds argues that the definition of "Seller Plaintiff Fees" in the APA should be viewed in the context of this arrangement.

But there is no ambiguity in the definition of Seller Plaintiff Fees that would warrant the review of extrinsic evidence.[97] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[98] Accordingly, the Florida fee payment arrangement has no bearing on my interpretation of this term—even if the arrangement were fairly incorporated into the record. Regardless

---

[94] APA § 2.01(c)(vii); *see also* 2023 Op. *16. Assumed Plaintiff Fees are "plaintiffs' attorneys' fees attributable to any post-Closing increases in volume of sales . . . of any of the [Acquired Brands]." APA § 2.01(c)(vii); *see* 2023 Op. at *16.

[95] APA Ex. A at A-16; Reynolds' Pre-trial Br. 44.

[96] ITG Brands, LLC's Combined Opening Br. in Supp. of Mot. for Summ. J. on Remedies and Answering Br. in Opp'n to Reynolds' Mot. for Summ. J. (Dkt. 343) ("ITG's Summ. J. Opening Br.") Ex. 5 (Florida Fee Payment Arrangement) § 21, App. A.

[97] *See supra* note 48 (citing case law).

[98] *See Osborn*, 991 A.2d at 1160.

31

of what Reynolds believes Seller Plaintiff Fees was intended to address, the Delaware Attorneys' Fees are encompassed within the phrase's plain terms.

Second, Reynolds argues that ITG's promise to "hold [Reynolds] harmless" automatically entitles Reynolds to the Delaware Attorneys' Fees.[99] It cites to the two Delaware Supreme Court decisions for the premise that "hold harmless" language is categorically "broad in scope" to the extent that it includes attorneys' fees.[100] But the cases on which Reynolds relies concern specific indemnification provisions that contained "hold harmless" language plus explicit statements that the indemnitor should pay the indemnitee for attorneys' fees and costs.[101] No such language exists in the APA.

---

[99] Reynolds' Pre-trial Br. 42-43.

[100] *Id.* (citing *Delle Donne & Assocs., LLP v. Millar Elevator Serv. Co.*, 840 A.2d 1244, 1256 (Del. 2004) and *Pike Creek Chiropractic Ctr., P.A. v. Robinson*, 637 A.2d 418, 422 (Del. 1994)).

[101] The indemnification provision at issue in *Delle Donne* required the indemnitor "to indemnify and hold harmless the other from and against all claims, damages, losses and expenses, *including reasonable attorneys' fees*, resulting from bodily injury . . . to any person . . . to the extent caused by the negligent acts or omissions of . . . the indemnifying party[]." *Delle Donne*, 637 A.2d at 1249 (emphasis added). The indemnification provision at issue in *Pike Creek* required "[t]he [e]mployee [to] hold the [e]mployer harmless and indemnify the [e]mployer, its successors, and assigns, against any liabilities and expenses, *including attorney's fees* which result from any acts and admissions [sic] of the [e]mployee." *Pike Creek*, 637 A.2d at 419-20 (emphasis added).

32

### C. Pre- and Post-Judgment Interest on the Award

Reynolds is also entitled to pre- and post-judgment interest on its damages award, compounded quarterly and applying a floating interest rate.[102] Pre-judgment interest accrues from the date Reynolds made each payment to Florida through the date a final judgment is entered in this action.[103] Post-judgment interest accrues from the date a final judgment is entered in this action.[104]

#### 1. Reynolds' Entitlement to Interest

ITG disputes only Reynolds' entitlement to pre-judgment interest in this action due to Reynolds' purported delayed in seeking indemnification.[105] Pre-judgment interest is generally only reduced in "situations involving 'inordinate' or deliberate delay."[106] Nothing of the sort is present here.

---

[102] Although the parties addressed this issue in their summary judgment briefing on remedies, in the 2023 Remedies Opinion, I reserved this issue for resolution after trial. *See* 2023 Op. \*23 & n.187.

[103] *See Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 508 (Del. 2001) ("A party is entitled to pre[-]judgment interest running from the date payment is due. . . . ."); *Delta Eta Corp. v. Univ. of Del.*, 2 A.3d 73, 2010 WL 2949632, at \*2 (Del. 2010) (TABLE) ("The general rule is that interest starts on the date when payment should have been made.").

[104] *Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 980 (Del. 2021).

[105] ITG's Summ. J. Opening Br. 34-35; ITG Brands, LLC's Reply Br. in Supp. of Mot. for Summ. J. on Remedies (Dkt. 362) ("ITG's Summ. J. Reply Br.") 32-34.

[106] *Williams Cos., Inc. v. Energy Transfer LP*, 2022 WL 3650176, at \*7 (Del. Ch. Aug. 25, 2022) (citing *Moskowitz v. Mayor & Council of Wilmington*, 391 A.2d 209, 211 (Del. 1978)).

ITG initiated this action in 2017, requesting a declaration that (a) ITG did not assume the liability for any payments owed to Florida for ITG's sales of the Acquired Brands post-closing of the APA, (b) that it did not need to indemnify Reynolds, and (c) that Reynolds must indemnify it instead.[107] Reynolds' initial counterclaim, filed several weeks later, sought declaratory relief that was the opposite of ITG's requests.[108] Reynolds amended its counterclaim more than three years later to add a request for indemnification from ITG for the losses it had sustained—and would continue to sustain—due to the Florida Judgment Liability.[109]

Reynolds' delay in waiting until August 2021 to advance an indemnification counterclaim was not "inordinate."[110] Reynolds' contention that it is entitled to indemnification related back to its initial counterclaim. ITG was on notice of Reynolds' intent to seek indemnification and, in 2017 and 2019, the parties even litigated substantive motions addressing whether the Florida Judgment Liability had been assumed by ITG under the APA.[111]

---

[107] Dkt. 1. As noted above, when ITG filed this action, the Florida court had not yet entered the Florida Judgment. The payments contemplated are those that ultimately became the Florida Judgment Liability.

[108] Dkt. 30.

[109] Dkt. 136 at Ex. A ¶¶ 150-57. Reynolds' motion to amend was granted on August 23, 2021. Dkt. 137.

[110] *See supra* note 106 and accompanying text.

[111] *See generally* 2017 Op.; 2019 Op.

Reynolds also reasonably waited to assert its indemnification counterclaim, relying on the principle that a claim for indemnification is unripe until the underlying liability has been resolved.[112] As such, Reynolds did not bring its indemnification claim here until exhausting its legal remedies in Florida, which occurred on December 18, 2020.[113] Reynolds' indemnification claim was raised eight months later.

### 2. Compound Interest

Modern Delaware law typically applies compound interest.[114] The interval of

---

[112] *See Brenner v. Albrecht*, 2012 WL 252286, at *6 (Del. Ch. Jan. 27, 2012); *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 198 (Del. 2009) (explaining that an indemnification claim does not accrue "[u]ntil the final judgment of the trial court withstands appellate review" (citation omitted)).

[113] *R.J. Reynolds Tobacco Co. v. State*, 2020 WL 7419535, at *1 (Fla. Dec. 18, 2020). ITG concedes that this was Reynolds' reason for delay, noting that its delay in advancing counterclaims here was due to its focus on the Florida litigation. ITG's Summ. J. Opening Br. 34.

[114] *See, e.g.*, *Williams Cos.*, 2022 WL 3650176, at *6 ("[C]ompound interest more accurately reflects . . . 'fundamental economic reality.'" (citation omitted)); *In re Cellular Tel. P'ship Litig.*, 2022 WL 698112, at *58 (Del. Ch. Mar. 9, 2022); *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *26 (Del. Ch. Feb. 21, 2019); *Murphy Marine*, 2022 WL 4296495, at *24 (explaining, in a breach of contract action, that "[c]ompounding interest better reflects the financial realities of conducting business and serves the interest of putting injured parties back into the position they were before the breach."); *Domain Assocs., L.L.C. v. Shah*, 2018 WL 3853531, at *20 (Del. Ch. Aug. 13, 2018); *Schneider Nat'l Carriers, Inc. v. Kuntz*, 2022 WL 1222738, at *32 (Del. Super. Ct. Apr. 25, 2022); *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 3655257, at *17 (Del. Ch. Aug. 1, 2018), *vacated sub nom. on other grounds Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482 (Del. 2019); *CompoSecure, L.L.C. v. CardUX, LLC*, 2018 WL 660178, at *45 (Del. Ch. Feb. 1, 2018), *aff'd in part, rev'd in part on other grounds*, 206 A.3d 807 (Del. 2018).

compounding is discretionary.[115]  But quarterly compounding is common.[116]

Nevertheless, ITG contends that simple interest should apply.[117]  It first notes that the Florida Judgment Liability applied simple interest and argues that "there is no reason why Reynolds should be awarded more interest than it had to pay Florida on the same payments."[118]  But Florida's calculation is irrelevant to my analysis under Delaware law.  Next, citing *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, ITG asserts that Delaware courts have "traditionally disfavored" compound interest.[119]  It fails to mention, however, that *Gotham Partners* went on to declare that the traditional "rule or practice of awarding simple interest, in this day and age, ha[d] nothing to commend it—except that it ha[d] always been done that way in the past."[120]  *Gotham Partners* launched the current practice of awarding

---

[115] *Glidepath*, 2019 WL 855660, at *26.

[116] *See Murphy Marine*, 2022 WL 4296495, at *24 (explaining that the court typically looks to the legal rate of interest as a benchmark and, when it does so, "the appropriate compounding rate is quarterly" (citing *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *12 (Del. Ch. May 20, 2004))); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003) (applying quarterly compounding interval because "the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly").  Of the cases cited *supra* note 114, all but *Cellular Telephone* applied a quarterly interval.

[117] ITG's Summ. J. Opening Br. 35-36.

[118] *Id.* at 35.

[119] *Id.* (citing *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 173 (Del. 2002)).

[120] *Gotham P'rs*, 817 A.2d at 173.

36

compound interest.[121]

Compound interest is appropriately awarded here.

### 3. Floating Interest Rate

Finally, Reynolds asks that I apply a floating interest rate.[122] This approach makes sense in view of the misaligned incentives created by using a fixed interest rate. Set too high, the plaintiff will be incentivized to delay suit as interest rates decrease because the lawsuit is a better investment for the plaintiff than the market. The incentives are reversed where the interest rate is fixed too low; the defendant is better off delaying judgment and investing the money it would have used to pay in the market.

Despite the logic in a floating interest rate, ITG insists that a fixed rate is appropriate.[123] It relies principally on *TranSched Systems Ltd. v. Versyss Transit Solutions, LLC*, where the court applied a fixed statutory interest rate.[124] But the

---

[121] Notably, each of the cases relied on by ITG for simple interest predate *Gotham Partners*. *See, e.g.*, *Rexnord Indus., LLC v. RHI Hldgs., Inc.*, 2009 WL 377180, at *9 (Del. Super. Feb. 13, 2009) (citing *Brandin v. Gottlieb*, 2000 WL 1005954 (Del. Ch. July 13, 2000)).

[122] Defs.' Opening Br. in Supp. of Defs.' Mot. for Summ. J. on Remedies (Dkt. 336) 11.

[123] ITG's Summ. J. Opening Br. 36.

[124] *Id.* (citing *TranSched Sys. Ltd. v. Versyss Transit Sols., LLC*, 2012 WL 1415466, at *6 (Del. Super. Mar. 29, 2012). The *TranSched* court explained that this approach was intended to "encourage[] parties to resolve disputes as quickly as possible to avoid accumulating interest on their judgments." *TranSched*, 2012 WL 1415466, at *6. This assertion is logically unsound for the reasons stated above: a fixed interest rate may incentivize a party to resolve a dispute slowly, depending on its predictions regarding the

37

*TranSched* court acknowledged that the interest rate it applied under statute was "not a fair reflection of the cost of money" since it had been set five years earlier.[125] And after *TranSched*, the Court of Chancery adopted a floating interest rate in *Levey v. Browstone Asset Management LP*, noting that this approach both "adequately reimburses a plaintiff 'for the loss of use of its capital' by replicating the economic circumstances that existed during the litigation . . . [and] forces the defendant to disgorge the benefits 'enjoyed during the same period.'"[126] Since *Levey*, Delaware courts have consistently applied floating interest rates.[127] I see no basis to deviate from that approach here.

---

movement of interest rates in the future, as well as whether it is in the position of the plaintiff or the defendant. ITG also argues that the Delaware Supreme Court endorsed *TranSched*'s use of a fixed interest rate in *Noranda.* 269 A.3d at 979-82. *See* ITG's Summ. J. Opening Br. 36 n.128. But *Noranda* did not address the issue of a fixed interest rate versus a floating interest rate.

[125] *TranSched*, 2012 WL 1415466, at *5.

[126] *Levey v. Browstone Asset Mgmt., LP*, 2014 WL 4290192, at *1 (Del. Ch. Aug. 29, 2014).

[127] *See, e.g., Cellular Tel.*, 2022 WL 698112, at *58 ("Pre- and post-judgment interest . . . will accrue at the legal rate, with the legal rate changing with fluctuations in the underlying reference rate."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs.*, 2018 WL 3326693, at *45 (Del. Ch. July 6, 2018); *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *46 (Del. Ch. Aug. 27, 2015); *Glidepath*, 2019 WL 855660, at *25; *Domain*, 2018 WL 3853531, at *20; *Schneider*, 2022 WL 1222738, at *32; *Oxbow*, 2018 WL 3655257, at *17; *CompoSecure*, 2018 WL 660178, at *45.

## III. CONCLUSION

ITG must pay Reynolds the full amount of Losses Reynolds incurred because of the Florida Judgment Liability, in the amount of $251,494,528.02.[128] This sum includes Reynolds' payments to Florida (including interest[129]), without any offset based on how the Profit Adjustment might have been calculated if ITG had joined the Florida Settlement Agreement. Reynolds is also entitled to pre- and post-judgment interest on this amount, as detailed above.

Reynolds is not entitled to indemnification for the Delaware Attorneys' Fees incurred in this litigation.

The parties are to confer on a form of final order and judgment to implement this decision, the 2022 Liabilities Opinion, and the 2023 Remedies Opinion. If there are any further matters to be resolved before the parties can submit a final order, they are to notify me by joint letter within 14 days. Otherwise, a proposed form of final order (or competing forms of order if the parties cannot agree) must be filed within 30 days.

---

[128] *See supra* note 15, tbl. 1, and accompanying text; PTO ¶ 63.

[129] *See supra* note 31 and accompanying text. This refers to the "Florida Judgment Interest" discussed in the 2023 Remedies Opinion.